04-3300(L), 04-3464(CON), 04-3545 (CON), 04-3871(CON)
Gruer v. Merck-Medco Managed Care, LLC

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2004

(Argued: May 18, 2005    Appeal Reinstated:  November 9, 2006    Decided: October 4, 2007)

Docket Nos. 04-3300-cv(L), 04-3464-cv(CON), 04-3545-cv (CON), 04-3871-cv(CON)

---

CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE
FUND, SWEETHEART CUP COMPANY, INC., and IRON WORKERS TRI-STATE
WELFARE FUND,

Movants-Appellants,

LINDA J. CAHN, ESQ.,

Movant-Appellant,

GROUP HOSPITALIZATION AND MEDICAL SERVICES, d/b/a CAREFIRST BLUE CROSS
BLUE SHIELD,

Movant-Appellant,

- v. -

MERCK-MEDCO MANAGED CARE, L.L.C., a/k/a MEDCO HEALTH SOLUTIONS, INC.,

Defendant-Counter-Claimant-Appellee,

FRANK STEVE McMILLAN, DAVID J. GIBSON, ADAM MILES, MONICA KEIM, on behalf
of Northwest Airlines Prescription Plan and all other similarly situated plans, PAMELA STOLZ,
on behalf of Northwest Airlines Prescription Plan and all other similarly situated plans,
ROSEMARIE DeLONG, CARL J. GOODMAN, TRUSTEES OF THE UNITED FOOD &
COMMERCIAL WORKERS, GARY PIETRZAK, on behalf of the Minnesota Teamsters Health
and Welfare Benefit Plan, and PEABODY ENERGY CORPORATION,

Consolidated Plaintiffs,

BETTY JO JONES,

Intervenor Plaintiff,

GENIA GRUER, on behalf of herself and all others similarly situated, WALTER J. GREEN, on behalf of himself and all others similarly situated, MILDRED BELLOW, on behalf of herself and all others similarly situated, ELIZABETH O'HARE, on behalf of herself and all others similarly situated, EMPLOYERS HEALTH AND WELFARE PLAN AND TRUST, and MARGARET J. WEENER,

Plaintiffs-Appellees,

MARISSA JANAZZO, as fiduciary for The County Line Buick Nissan Employee Welfare Benefit Plan, on behalf of herself as fiduciary and all other similarly situated fiduciaries of employee welfare benefit plans,

Plaintiffs-Counter-Defendants-Appellees,

HARRY J. BLUMENTHAL JR. and ALAN HORWITZ, as fiduciaries for the Blumenthal Print Works, Inc. Welfare Benefit Plan, on behalf of themselves as fiduciaries and all other similarly situated welfare benefit plans,

Plaintiffs.

_____

Before:  MINER and POOLER, Circuit Judges, and BLOCK, Judge.*

Appeals from a judgment entered June 28, 2004 in the United States District Court for the Southern District of New York (Brieant, J.) finally approving a settlement agreement in a class action brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), the District Court having incorporated orders (i) certifying the class action pursuant to FED. R. CIV. P. 23(a) and (b)(3); (ii) denying a motion by movant-appellant health benefit payor to intervene in the class action; (iii) approving the amended proposed settlement agreement as fair, reasonable, and adequate; (iv) awarding legal fees and disbursements; and (v) severing cases in which the ERISA plans opted out of the settlement.  Also challenged on appeal is the order of the District Court on remand dated August 10, 2006 finding constitutional standing on the part of the certified representative plaintiffs.

Affirmed in part; vacated and remanded in part.

_____

* The Honorable Frederic Block, Senior District Judge for the Eastern District of New York, sitting by designation.

KENNETH P. ROSS, Coleman Law Firm, Chicago, IL (Robert F. Coleman and Sean B. Crotty, Robert F. Coleman & Associates, Chicago, IL, and Eugene I. Pavalon, Pavalon, Gifford, Laatsch & Marino, Chicago, IL, on the brief), for Movants-Appellants Central States Southeast and Southwest Areas Health and Welfare Fund, Sweetheart Cup Company, Inc., and Iron Workers Tri-State Welfare Fund.

W. SCOTT SIMMER, Robins, Kaplan, Miller & Ciresi LLP, Washington, D.C. (Christopher P. Sullivan, Robins, Kaplan, Miller & Ciresi LLP, Washington, D.C., and Robert A. Scher, Foley & Lardner LLP, New York, NY, on the brief), for Movants-Appellants Group Hospitalization and Medical Services d/b/a Carefirst Blue Cross Blue Shield.

LINDA J. CAHN, Law Firm of Linda J. Cahn, Esq., Morristown, NJ, Movant-Appellant.

ARTHUR N. ABBEY, Abbey Spanier Rodd & Abrams LLP, New York, NY (Karin E. Fisch, on the brief), for Plaintiffs-Appellees Elizabeth O'Hare, Genia Gruer, Mildred Bellow, Walter J. Green, and Marissa Janazzo.

PHILIPPE Z. SELENDY, Boies, Schiller & Flexner LLP, New York, NY (David Boies and Edward Normand, Boies, Schiller & Flexner LLP, Armonk, NY, on the brief), for Plaintiffs-Appellees Elizabeth O'Hare, Genia Gruer, Mildred Bellow, Walter J. Green, and Marissa Janazzo.

STEPHEN J. HERMAN, Mathis, Casey, Kitchens & Genell, LLP, New Orleans, LA, for Intervenor Plaintiff Betty Jo Jones.

MINER, Circuit Judge:

These appeals challenge the District Court's approval of an amended settlement agreement (the "Settlement Agreement") reached in a class action lawsuit brought against defendant-counter-claimant-appellee Merck-Medco Managed Care, L.L.C., a/k/a Medco Health Solutions, Inc., and its former parent company, Merck & Co., Inc. (collectively, "Medco"), by a plaintiff class of employee welfare benefit plans (the "Plaintiffs"). Plaintiffs, the trustees and beneficiaries of various employee welfare benefit plans, brought this action alleging that Medco breached its fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA") by failing to act in their best interest in its capacity as a pharmaceutical benefits manager for the plans. Movant-appellant Group Hospitalization and Medical Services, doing business as CareFirst Blue Cross Blue Shield ("CareFirst"), appealed from the judgment of the District Court denying CareFirst's motion to intervene in the class action litigation and approving the Settlement Agreement. Movants-appellants CareFirst, Central States Southeast and Southwest Areas Health and Welfare Fund ("Central States"), Sweetheart Cup Company, Inc. ("Sweetheart"), Iron Workers Tri-State Welfare Fund ("Iron Workers"), and Linda J. Cahn, Esq. ("Cahn") (collectively, "Movants-Appellants") all appealed from the same judgment of the District Court incorporating orders (i) certifying the instant action as a class action pursuant to FED. R. CIV. P. 23(a) and (b)(3); (ii) approving the amended Settlement Agreement as fair, reasonable, and adequate; (iii) awarding legal fees and disbursements; and (iv) severing cases in which the ERISA plans opted out of the settlement.

On appeal, we determined that serious questions had been raised as to whether the certified representative Plaintiffs had constitutional standing to assert ERISA claims and to enter

4

into the Settlement Agreement on behalf of the class. Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 185 (2d Cir. 2005). We therefore remanded to the District Court for consideration of the standing issue and retained jurisdiction pursuant to United States v. Jacobson, 15 F.3d 19 (2d Cir. 1994). Cent. States, 433 F.3d at 202–04. Following remand, the District Court reviewed additional evidence submitted by the parties and concluded that Plaintiffs had established standing. Having remanded for a limited purpose, we now resume jurisdiction of this case at the parties' request. We assume familiarity with our earlier opinion, the underlying facts, the procedural history, and the scope of issues presented on appeal, to which we refer only as necessary to explain our decision. Upon our review, we agree with the District Court that Plaintiff Marissa Janazzo has established standing, but we conclude that the court erred both in certifying the class without properly considering the conflicts of interest among members of the class and in approving the Settlement Agreement. We therefore vacate the judgment of the District Court and remand for further proceedings consistent with this Opinion. We affirm the judgment in all other respects.

**BACKGROUND**

I.   ERISA Litigation and the Settlement Agreement

   A.   Litigation History

Plaintiffs are the trustees and beneficiaries of employee welfare benefit plans (the "Plans") that directly or indirectly contracted with Medco to receive pharmacy benefit management services. As a pharmaceutical benefits manager ("PBM"), Medco was endowed with discretionary authority to manage certain aspects of the Plans for the primary purpose of containing pharmaceutical costs. By way of an indirect contract, insured Plans paid set

premiums to their insurance companies in exchange for full payment of their beneficiaries' prescription drugs, and the insurance companies in turn contracted with Medco for plan management services. By contrast, capitated Plans paid set premiums directly to Medco in exchange for full payment of their beneficiaries' drugs. In the case of both the insured and capitated Plans, respectively, the insurer or Medco bore the risk of higher drug cost in paying each beneficiary's claims for prescription medications. Plans that were self-funded, however, did not pay set premiums to either an insurer or to Medco and instead paid the entire cost of the prescription drugs directly to Medco as PBM or through a third-party administrator for a fee. Accordingly, self-funded Plans alone carried the direct risk of higher drug cost.

Plaintiffs alleged in their Complaint that Medco breached its fiduciary duties to their Plans under ERISA in its capacity as PBM by (i) managing formularies — lists of preferred prescription drugs — to favor the products of its parent company, Merck & Co., Inc. ("Merck"), over competing drugs; (ii) implementing programs tending to increase the sales of Merck drugs, including by interchanging lower cost competing drugs with relatively higher cost Merck drugs; (iii) entering into drug purchase contracts with pharmaceutical manufacturers, including Merck, that included price, rebate, and discount terms that were favorable to Medco but more costly to the Plans; (iv) engaging in practices prohibited under ERISA, including the effective transfer of Plan assets to Merck through drug purchase agreements with Merck negotiated by Medco; and (v) generally failing to disclose to the Plans that it was not acting in their best interest but in the interests of Merck. Medco's motion for summary judgment dismissing the Complaint was deferred pending discovery and later withdrawn due to settlement negotiations that culminated in the Settlement Agreement.

On July 31, 2003, the same day that it preliminarily approved the Settlement Agreement, the District Court preliminarily granted Plaintiffs' motion for certification of the class, which included all employee welfare benefit plans that contracted with Medco, whether they were self-funded, insured, or capitated. The named plaintiffs in four of the consolidated class action cases, Genia Gruer, Walter Green, Mildred Bellow, and Elizabeth O'Hare (collectively, the "Individual Plaintiffs"), are individual Plan beneficiaries seeking derivative relief for each of their Plans and their members, as well as for all similarly situated Plans that contracted directly with Medco on a capitated basis or with insurers that contracted with Medco. The fifth named plaintiff, Marissa Janazzo (now Marissa Salsbury) ("Janazzo"), is a Plan trustee purporting to sue on behalf of the County Line Buick Nissan Employee Welfare Benefit Plan (the "County Line Plan") and all similarly situated Plan trustees whose plans contracted directly with Medco or with third-party administrators or insurers that contracted with Medco. Harry J. Blumenthal Jr. and Alan Horwitz, the named plaintiffs in a sixth case, are Plan trustees suing on behalf of their Plan (the "Blumenthal Plan") and on behalf of all other similarly situated Plan trustees whose Plans contracted directly with Medco.[1]

B.      Provisions of the Settlement Agreement

The Settlement Agreement defined the class to include all employee welfare benefits Plans that had either direct contracts with Medco or indirect contracts with Medco through insurance companies, third-party administrators, HMOs, Blue Cross Blue Shield entities, or any other intermediaries (collectively, third-party administrators or "TPAs"), where the contracts were in force at any time between December 17, 1994 and the date of the final approval of the

---

[1] The Blumenthal Plan ultimately elected to opt out of the class.

settlement and were subject to ERISA. Under the Settlement Agreement, Medco agreed, among other things, to pay $42.5 million into a settlement fund to be paid to class members. Attorneys' fees, not to exceed 30%, together with expenses, also would come from the fund. In exchange, Plaintiffs agreed to release all claims of the class insofar as they arose under ERISA or were in any way connected to the actions that were the subject of the Complaint against Medco. Plaintiffs further agreed to release those claims against TPAs, as well as Plan sponsors that contracted with TPAs, that were connected to Medco's alleged conduct. Plaintiffs did not, however, release antitrust claims or any contract claims not arising under ERISA.

The settlement fund allocates an amount to the settling class members that is based primarily on the amount of each settling Plan's proportionate share of the total drug spend of all settling Plans for the class period. Accordingly, each Plan's proportionate share of the total drug spend varies depending on the nature of the Plan's relationship with Medco. Insured or capitated Plans, which paid set premiums to an insurance company or Medco in exchange for full payment of their members' drug prescriptions, receive an allocation that is reduced by 55% to reflect the fact that they were more insulated from the conduct alleged in the Complaint. Said differently, if a Plan "pays for prescription drug benefits on an insured or capitated basis (e.g., a fixed premium or per-member, per-month sum) or if [the] Plan does not participate in any brand-to-brand therapeutic interchange program administered by Medco, [its] proportionate share of the total drug spend will be reduced by fifty-five percent (55%) to reflect the fact that [the] Plan could not have been damaged directly by certain of the conduct that Plaintiffs allege increase[d] costs to Plans." By contrast, Plans that were self-funded and assumed the financial risk of paying for their members' prescriptions in their entirety receive a proportionate share of the total drug spend

without any reduction.

II.      Objections to the Settlement Agreement by the Self-Funded Plans

After the District Court preliminarily granted Plaintiffs' motion for class certification and approval of the Settlement Agreement, the Class Notice issued notifying class members of the proposed Settlement Agreement and informing them that they could opt out of the class. At the ensuing hearing to determine the fairness of the Settlement Agreement, approximately 200 individual Plans exercised their right to opt out of the settlement. In addition, several self-funded Plans asserted that their interests were not adequately protected by the settling Plaintiffs. Central States, Iron Workers, and Sweetheart (collectively, the "Self-Funded Plans") objected both to the certification of the class and to the terms of the Settlement Agreement and sought leave to intervene in the class action to represent all of the self-funded Plans, which they argued should be a certified subclass. The Self-Funded Plans first asserted that there was a conflict of interest in the representation of the class and that only a self-insured Plan or sponsor could adequately represent their interests, because the Plans that paid set premiums to Medco or insurers to avoid the risk of paying claims would share in the settlement fund notwithstanding the fact that they suffered no damages. Following the fairness hearing, the District Court rejected these claims and held that:

> [I]n practical reality no such conflict of interest exists. The same legal theory underlies all [c]lass [m]embers' claims, that Medco violated ERISA in exercising its discretionary authority to negotiate with drug manufacturers on behalf of its [P]lan sponsors, and in its control over the formularies and therapeutic drug interchange program. Although the negative drug interchange claim directly affected the self-funded [P]lans as opposed to the insured [P]lans, this is insufficient to find a conflict of interest exists. Class [c]ounsel determined that Medco's failure to pass through rebates may have increased or failed to reduce the drug-acquisition costs of the members of the insured [P]lans in addition to those

9

of the self-funded [P]lans. Accordingly, the 55% reduction applying to the insured [P]lans was determined to be a reasonable discount of their claims. "Even where there are some individualized damages issues," common issues may predominate "when liability can be determined on a class-wide basis." In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 139 (2d Cir. 2001).

In re: Medco Health Solutions, Inc., Pharmacy Benefits Mgmt. Litig., No. 03 MDL 1508 (CLB), 2004 WL 1243873, at *4 (S.D.N.Y. May 25, 2004).

The Self-Funded Plans next claimed that the allocation of settlement funds between the self-funded Plans and the insured or capitated Plans was unfair, inadequate, and unreasonable, because "the Settling Plaintiffs did not submit proof as to how, during their negotiations, they calculated the 55% reduction in recovery for self-insured [P]lans." Id. at *7. The District Court also rejected this contention and held simply that the reduction "balances the equities" among self-funded and insured Plans. Id. In upholding the 55% figure, the court deferred to class counsel who negotiated the Settlement Agreement:

> [T]he allocation is reasonable. . . . The insured or capitated fund[s] were not directly financially damaged by the actions of Medco on the negative interchange claim because the Plans paid a flat capitation for every person regardless of the type of drug prescribed. Through the negotiation process, relying on advice from experts of their own choosing and assistance by the Special Maser, and in light of the important non-monetary benefits of the Settlement, Class counsel determined to discount the allocation of the [s]ettlement [f]und to insured [P]lans relative to the self-funded [P]lans as provided in the Settlement Agreement.

Id. at *9.

In addition, the Self-Funded Plans claimed that the Settlement Agreement inadequately described the distribution of the settlement funds. Specifically, they contended that the language in the Class Notice and the Settlement Agreement providing that the allocation of funds "shall be made primarily on the basis of each settling Plan's proportionate share of the total drug spend of

10

all settling Plans" did not sufficiently (i) explain the meaning of "primarily"; (ii) disclose the non-primary bases for determining allocation; or (iii) indicate the total drug spend of the proposed class during the class period. Id. at *4. The Self-Funded Plans also contended that there was no basis to determine whether the $42.5 million settlement amount was reasonable. Id. The District Court rejected these contentions and concluded that the Plan of Allocation was "reasonable and fair." Id.

Finally, the Self-Funded Plans argued that the Class Notice and paragraph seventeen of the Settlement Agreement were unclear as to which claims would be retained by the class members. Paragraph seventeen of the Settlement Agreement provides:

> Nothing in [the release] is intended to release or to be construed to release Medco from contract claims asserted by parties with which Medco has contracted to provide services, including (where permitted by applicable state law) contract claims for breach of implied covenant of good faith and fair dealing, provided, however, that claims not based on contract are released to the extent provided for in [the release]. Nothing in paragraph [sixteen] is intended to release or to be construed to release TPAs from contract claims asserted by parties with which any TPA has contracted to provide services, including (where permitted by applicable state law) contract claims for breach of the implied covenant of good faith and fair dealing, provided, however, that claims not based on contract are released as provided for in [the release].

In interpreting the Agreement, the District Court held that the language was unambiguous with respect to which claims would be released and reasoned as follows: "The Amended Settlement Agreement is clear and it speaks for itself. Further, it was admitted by Medco during the December 11, 2003, conference that 'the contract claims are carved out and not released. . . . Medco agrees with settling counsel that none of the contract claims will be released for any of Medco's clients and no contract claims are preempted by ERISA.'" Id. at *5.

III.    CareFirst's Motion to Intervene in the Class Action

11

Subsequently, CareFirst, a TPA that provides insurance and administrative services to insured and self-funded Plans governed by ERISA, opposed certification of the settling class and filed a motion to intervene in order to argue that the opt-out provisions of the Class Notice should include the right of a health benefit payor to opt out of the settlement class, and to challenge certification of the class in the event that its opt-out were deemed ineffective. CareFirst sought to exclude itself from the class action settlement both as the insurer and the TPA of the ERISA Plans it administered.

As a TPA, CareFirst claimed that it "is bound by contract and course of dealing to act on behalf of its self-funded plan customers to pursue overpayment of benefits" and that "[i]nsurers and TPAs were specifically carved from the class, yet the plans they insured and administered were included [in the class]." CareFirst thus argued that its claims against Medco, some of which are being litigated in another action in New Jersey, see Group Hospitalization & Med. Servs., d/b/a CareFirst Blue Cross Blue Shield v. Merck-Medco Managed Care, L.L.P., No. CAM-L-4144-03 (N.J. Sup. Ct. 2003), could be improperly released by the Settlement Agreement if CareFirst were denied an opportunity to opt out the claims of its insured and self-funded Plans.

The District Court denied CareFirst's motion to intervene, concluding that the right to accept or reject the proposed settlement belonged to the Plan fiduciaries and not to TPAs such as CareFirst. The District Court determined that "[b]ecause Care[F]irst is not a member of the [c]lass, and its rights will not be affected by the approval of the Settlement, Care[F]irst lacks standing to object on its own behalf and has failed to demonstrate that it has authority to act for a [P]lan in opting out." In re: Medco Health Solutions, Inc., 2004 WL 1243873, at *6. With

12

respect to CareFirst's concerns that its claims in the New Jersey action could be released as a result of the Settlement Agreement, the District Court concluded that the Agreement did not release any contract or other direct claims that TPAs may assert against Medco and that, in any event, a TPA was free to demand that its Plan opt out of the settlement. Id.

The District Court thereafter certified the instant action as a class action, pursuant to FED. R. CIV. P. 23(a) and (b)(3), and approved the Settlement Agreement, concluding that it was "within the range of fair, reasonable, and adequate settlement of the claims of the [c]lass." Id. at *16. The District Court also awarded legal fees and disbursements and held that "[t]hose consolidated cases in which the Plans have opted out of the settlement are hereby severed." Id.

IV.     Attorneys' Fees and Disbursements to Class Counsel and Linda Cahn

The settling Plaintiffs' counsel, Abbey Gardy LLP and Boies, Schiller & Flexner LLP, requested that the District Court approve their application for attorneys' fees in the amount of $12.75 million, or 30% of the settlement fund — a 1.79 multiple of their lodestar — and for disbursements in the amount of $893,294.50. From their fee award, Plaintiffs' counsel agreed to absorb payment of a reasonable fee to Lowey Dannenberg Bemporad & Selinger and Rawlings & Associates (collectively the "Lowey Firm"), which had requested a fee award in the amount of $637,500 — a 1.317 multiplier of its lodestar of $483,947.50 — and disbursements in the amount of $19,576.96. The District Court determined that counsel's requests were reasonable and approved their applications:

> [T]he present fee application for 30% of the [s]ettlement [f]und made by Abbey
> Gardy and Boies, Schiller & Flexner and including the services of the Lowey firm
> is reasonable. It is clear by [s]ettling Plaintiffs' submissions that [c]ounsel
> expended a substantial amount of time and effort in this litigation. The total
> combined lodestar for [s]ettling Plaintiffs' [c]ounsel and the Lowey firm is

13

$7,138,047.25, representing almost 16,000 hours spent litigating this case. Settlement negotiations began almost three years ago, and were completed only by the tremendous effort of counsel.

The litigation occurred over a period of six years, and was performed on a purely contingent basis, with [c]lass [c]ounsel advancing the many thousands of dollars of necessary disbursements. If, after trial, [c]lass Plaintiffs were unsuccessful, due to the contingent nature of the lawsuit, [s]ettling Plaintiffs' [c]ounsel would have received no compensation. [C]ontingency risk and quality of representation must be considered in setting a reasonable fee. Goldberger v. Integrated Res., Inc., 209 F.3d 43, 54 (2d Cir. 2000).

Settling Plaintiffs' [c]ounsels' request of 30% of the [s]ettlement [f]und, applies a multiplier of 1.786 to the submitted lodestar. This multiplier is reasonable and fair. . . .

The [c]ourt awards [s]ettling Plaintiffs' [c]ounsel (including the Lowey Firm) a fee award of 30% of the [s]ettlement [f]und, calculated as $12.75 million, less the award of legal fees to Linda J. Cahn . . ., and disbursements in the amount of $893,294.50 for [s]ettling Plaintiffs' [c]ounsel and disbursements for the Lowey firm in the amount of $19,576.96. Under the class notice, total fees may not exceed 30%.

Id. at *11.

In addition, Linda Cahn, attorney for the Blumenthal Plan, moved for an award of legal fees and disbursements to be paid out of the common fund that resulted from the Settlement Agreement. Cahn sought reimbursement for a lodestar of 2,182 hours, together with $4,698 in expenses, as well as an award of 10% of the total attorneys' fees awarded to class counsel of record. With respect to Cahn's application for fees, the District Court concluded that, although the Settlement Agreement had been agreed upon in principle by class counsel and without any input from Cahn, her participation was an important part in the finalization of its terms and that her efforts benefitted the class as to "support a reasonable legal fee out of the fund in the nature of quantum meruit." Id. at *13. The District Court determined, however, that there was "no

14

basis to award a percentage fee of the recovery to Ms. Cahn. She neither created the class action settlement nor did she induce acceptance of it by the Defendants. Her assistance was limited to fine tuning of provisions and documents after the [s]ettlement had been agreed to in principle." Id. Ultimately, the District Court awarded Cahn attorneys' fees and disbursements in the amount of $165,578, to be deducted from the 30% award to class counsel in light of the cap on total fees. Id. at *15.

IV.     Appeals to this Court

CareFirst appealed from the District Court's denial of its motion to intervene in the class action, contending that the court erred in determining that it was not a member of the class and therefore lacked standing to object to, or opt out of, the Settlement Agreement. Movants-Appellants all appealed from the same judgment incorporating orders (i) certifying the instant action as a class action, pursuant to FED. R. CIV. P. 23(a) and (b)(3); (ii) approving the amended Settlement Agreement; (iii) awarding legal fees and disbursements; and (iv) severing cases in which the ERISA plans opted out of the settlement.

On appeal, we did not reach the merits of the case because we concluded that the threshold question of Article III standing of the settling class Plaintiffs was insufficiently established. Cent. States, 433 F.3d at 185–86, 203. We determined that the District Court had failed to rule on the objections to Plaintiffs' standing raised by the parties and observed that "we do not have the benefit of the District Judge's views as to whether the Plaintiffs have demonstrated the requisite injury-in-fact for supporting a finding of constitutional standing." Id. at 200. With respect to the Individual Plaintiffs, we held that:

15

[S]erious questions remain as to whether the Individual Plaintiffs have demonstrated how Medco's alleged wrongdoings caused any injury to any individual or entity other than the Plans that Medco contracted with, and provided prescription benefit coverage to, during the class period. It is especially unclear whether any evidence supports the claim that Medco's drug-switching programs and formulary caused the Individual Plaintiffs — as opposed to the Plans to which they belong — any injury (either by paying more for prescription drugs or by having to take different prescription drugs), given that Plan participants generally pay a flat co-pay for a drug regardless of the cost of the drug. Seemingly, only plan participants who paid percentage coinsurance would incur injury if Medco favored the higher-cost drugs. . . . Similarly, the Individual Plaintiffs appear to have failed to demonstrate (i) that they incurred an injury resulting from Medco's failure to pass along formulary rebates to the Plans; or (ii) that they have been impacted by defendants' allegedly wrongful disclosures or misstatements.

Id. at 202–203 (footnote omitted).

With respect to Janazzo and the County Line Plan, we determined that:

The parties also have raised a considerable question regarding whether the fifth settling plaintiff, Janazzo, a Plan trustee, represents a Plan with Article III standing, given that Janazzo failed to produce a signed, executed contract between the Plan and either Medco or a TPA that contracted with Medco. Moreover, counsel for Medco also stated before the District Court that it "could not find any record of Medco sending a bill to County Line Buick [Janazzo's Plan] for drugs. [Medco does not believe] that [Janazzo's Plan is] a client of Medco." In the absence of evidence of a contractual relationship with Medco, Janazzo is precluded from demonstrating any injury resulting from Medco's alleged wrongdoings.

Id. at 203 (alterations in original). Accordingly, we remanded to the District Court to resolve the standing issue in any way it deemed proper and retained jurisdiction pursuant to United States v. Jacobson, 15 F.3d 19, 21–22 (2d Cir. 1994). Cent. States, 433 F.3d at 203.

V.    District Court's Decision on Remand

On remand, the District Court permitted the parties to submit additional discovery, including document and deposition discovery, to further develop the record as to the issue of Plaintiffs' standing. By Order dated August 10, 2006, the District Court determined that (i)

16

Janazzo, as Plan Trustee for County Line, established that her Plan had a contractual relationship with Medco and likely suffered an injury as a result of its conduct; (ii) the Individual Plaintiffs Green and Bellow suffered injury-in-fact and therefore had Article III standing; and (iii) all of the Individual Plaintiffs had representational and statutory standing under ERISA sufficient to satisfy Article III standing. Subsequently, Plaintiffs, CareFirst, and the Self-Funded Plans restored jurisdiction to this Court, and the parties filed supplemental letter briefs and appendices in accordance with this Court's previous decision. The District Court having issued its opinion on remand, our jurisdiction having been restored, and the standing issue having been fully briefed, we now resume jurisdiction over this case.

**ANALYSIS**

I.      Article III Standing

        A.      Standard of Review

        Whether a plaintiff has constitutional standing is a question of law that we review de novo. Field Day, LLC v. County of Suffolk, 463 F.3d 167, 175 (2d Cir. 2006) (citing Shain v. Ellison, 356 F.3d 211, 214 (2d Cir. 2004)).

        B.      Janazzo's Standing

        As a threshold matter, we note that only one of the named Plaintiffs is required to establish standing in order to seek relief on behalf of the entire class. See 1 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 2:6 n.3 (4th ed. 2002) ("To establish Article III standing in a class action, it is not required that each named plaintiff must have a claim against each named defendant. Rather, for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing

17

is satisfied and only then will the inquiry shift to a class action analysis"); see also Comer v. Cisneros, 37 F.3d 775, 788 (2d Cir. 1994). Plaintiffs contend that Janazzo represents a Plan with constitutional standing because the County Line Plan was involved in a contractual relationship with Medco during the class period. They assert that, during the first part of the class period, the County Line Plan operated as a self-funded Plan with M.D. Health Plan acting as its third-party administrator, and that, during the later part of the class period, the County Line Plan was fully insured through M.D. Health Plan. Plaintiffs further allege that M.D. Health Plan used Medco to manage its pharmaceutical benefits over the entire class period.

Based upon the record before us, we are satisfied that Janazzo has constitutional standing because the County Line Plan was Medco's client during the class period. Plaintiffs produced competent proof in support of County Line's contract with M.D. Health Plan, including: (1) a "Third Party Administrative Service Agreement" with M.D. Health Plan signed by a County Line representative; (2) a form letter from M.D. Health Plan apparently produced from County Line's files advising clients that it would consolidate its pharmaceutical services under Medco; (3) a letter from M.D. Health Plan to County Line's consultant, Brian Lynch, summarizing the Plan's transfer from self-funding to fully-insured status; (4) a "Group Administration Agreement" signed by a representative of M.D. Health Plan identifying Lynch as the "Agent of Record"; (5) a "Third Party Administrative Services Run-Out Agreement" signed by a representative of M.D. Health Plan and sent to Lynch; (6) Janazzo's applications for group insurance coverage on behalf of County Line listing M.D. Health Plan as Plan Supervisor; (7) copies of Janazzo's and her beneficiary father's drug prescriptions indicating group prescription coverage through M.D. Health Plan and a subsidiary of Medco; (8) invoices showing County Line's payment of

18

premiums to M.D. Health Plan; and (9) Lynch's sworn statement that County Line contracted with M.D. Health Plan with respect to its employee benefits, that he regularly dealt with M.D. Health Plan in assisting County Line, and that "M.D. Health Plan in turn used Merck-Medco Managed Care, Inc. ('Medco') for its pharmaceutical services for Countyline Motors."  Although each of the formal written agreements between County Line and M.D. Health Plan appears to be signed by only one party, the evidence, viewed in its totality, demonstrates at least an implied contract between the parties since they "agreed, either by words or actions or conduct, to undertake [some] form of actual contract commitment."  Cweklinsky v. Mobil Chem. Co., 364 F.3d 68, 77 (2d Cir. 2004) (applying Connecticut law).[2]  As the District Court correctly held on remand, these documents "still ha[ve] evidentiary value of both an intent to execute the [a]greement, and progress toward such execution."

The record also establishes a contract for plan management services between M.D. Health Plan and Medco during the time that M.D. Health Plan was involved with the County Line Plan. Significantly, it was Medco that produced documents showing that County Line employees filled drug prescriptions through its pharmaceutical network, and Medco does not dispute that it had a contractual relationship with M.D. Health Plan.  Indeed, Plaintiffs have filed under seal in this Court the "Integrated Prescription Drug Program Master Agreement" between M.D. Health Plan

---

[2] The parties do not dispute that the relationship between the County Line Plan and M.D. Health Plan is governed by Connecticut law.  Both the County Line Plan and M.D. Health Plan are based in Connecticut, and their contractual relationship evolved wholly in Connecticut. Moreover, the "Third Party Administrative Service Agreement" and the "Third Party Administrative Services Run-Out Agreement" each contains a choice-of-law clause providing that the validity, interpretation, and performance of the agreement shall be controlled by Connecticut law.

19

and Medco demonstrating that Medco was the exclusive provider of prescription drug benefits to M.D. Health Plan at that time.

We reject the Self-Funded Plans' claim that Janazzo must establish specific financial harm before her Plan has standing, since it conflates a defense to the merits of the Plan's claim against Medco with the requirement to make a threshold jurisdictional showing. In our view, the foregoing evidence supports the District Court's determination that Janazzo's Plan was involved in a contractual relationship with Medco so as to give her standing. Accordingly, we need not reach the issue of standing as it pertains to any of the other named Plaintiffs and instead proceed to the merits of this case.[3]

II.     CareFirst's Motion to Intervene

CareFirst argues that the District Court abused its discretion in denying its motion to intervene and refusing to hear its objections to class certification. With respect to the court's denial of its motion to intervene, CareFirst contends that it is prevented from acting under contract to "pursue overpayment of benefits" on behalf of the self-funded plans that it administers because "TPAs were specifically carved from the class, yet the plans they ensured and . . . administered were included." CareFirst also claims that the District Court's denial of its motion has the effect of improperly releasing its claims as an insurer in a parallel New Jersey

---

[3] In addition to arguing that they have incurred individualized injury, the plan participants and beneficiaries on remand and in this round of briefing urge that (1) they have representational standing under the doctrine enunciated in Vermont Agency of Natural Res. v. United States, 529 U.S. 765 (2000), and (2) they have standing to assert the vindication of the intangible right to the honest services of fiduciaries guaranteed to them by ERISA. Because these theories were not argued to us in an intelligible fashion prior to our original decision, that decision should not be read as rejecting them. Because addressing these difficult issues is not necessary to our resolution of the standing issue in this case, we express no opinion on them. Instead, we leave their resolution to a future panel.

action without compensation and results in prejudice because the Settlement Agreement "distribut[es] proceeds directly to CareFirst's insured customers, thus bypassing CareFirst." With respect to the District Court's certification of the class, CareFirst contends that (i) the claims of the class do not raise questions common to all class members; (ii) the claims of the class are not typical of those of the class; and (iii) the class representatives do not adequately represent the interests of the class.

We are not persuaded by CareFirst's contentions because CareFirst lacks the authority to opt out the claims of the Plans that it administers or object to the settlement on their behalf. Neither the certified class nor the Settlement Agreement includes TPAs such as CareFirst. Indeed, TPAs are expressly excluded from the class, which includes only Plans, and only the Plans' fiduciaries can opt out their Plans in accordance with the provisions of the Settlement Agreement: "TPAs are excluded from the definition of the class except that to the extent a given TPA is a plan sponsor with respect to an employee benefit plan, the TPA shall be a member of the class solely in such capacity." As the District Court correctly observed, "[t]he fiduciary duty is vested in the Plan sponsor or the designated fiduciary named in any particular [P]lan, and such statutory duty may not be evaded by delegation to an administrator. If anybody's rights were violated by [Medco], it was the rights of the Plan not the administrator with whom the Plan fiduciaries contracted." See 29 U.S.C. § 1104(a)(1)(A) (providing that "a [plan's] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan). Because CareFirst is not a class member, it does not have an affected interest in the class Plaintiffs' claims

21

against Medco so as to be able to assert its objections on behalf of its Plans. "Nonparties to a settlement generally do not have standing to object to a settlement of a class action." 4 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 13:69 (4th ed. 2002); see also In re Drexel Burnham Lambert Group, Inc., 130 B.R. 910, 923 & n.8 (S.D.N.Y. 1991) (citing cases), aff'd, 960 F.2d 285 (2d Cir. 1992).

CareFirst's argument that it could be prejudiced in a parallel action against Medco in New Jersey is unavailing for essentially the same reasons. TPAs are not members of the class, and as such, no actionable claim held by CareFirst in New Jersey is released by the terms of the Settlement Agreement. Stated simply, CareFirst would possess the same legal rights against Medco whether or not the Settlement Agreement were approved. If CareFirst believes that any Plan is obligated to opt out, it may exercise its discretion to make such a demand upon that Plan. In any event, because CareFirst's rights against Medco would not be impaired by the disposition of this action, its intervention would serve no purpose. Accordingly, we cannot say that the District Court abused its discretion in denying CareFirst's motion.

III.    Challenges to Class Certification

A.    Standard of Review

Turning next to the challenges raised to the certification of the class, this Court reviews a district court's approval of a class certification under an abuse of discretion standard of review. As this Court recently has observed:

> We review the district court's order granting class certification for abuse of
> discretion, a deferential standard. See Parker v. Time Warner Entm't Co., 331
> F.3d 13, 18 (2d Cir. 2003). "A district court 'abuses' or 'exceeds' the discretion
> accorded to it when (1) its decision rests on an error of law (such as the

22

application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." Zervos v. Verizon N.Y., Inc., 252 13 F.3d 163, 169 (2d Cir. 2001) (footnotes omitted).

In re Simon II Litig., 407 F.3d 125, 132 (2d Cir. 2005).

B.      Requirements for Class Certification

Federal Rule of Civil Procedure 23(a) sets forth the requirements for a class action:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).  Said differently, in order to qualify for class certification, plaintiffs in the proposed class must demonstrate that they satisfy four requirements:  (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  See FED. R. CIV. P. 23(a).

The numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible — only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate.  "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact."  Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (per curiam).  Typicality "requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  Robinson v. Metro-N. Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001).  Adequacy of representation means that the class representatives "will fairly and

23

adequately protect the interests of the class." Denney v. Deutsche Bank AG, 443 F.3d 253, 267 (2d Cir. 2006) (internal quotation marks omitted). If the foregoing criteria are satisfied, the court must then decide whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and whether a class action "is superior to other available methods for the fair and efficient adjudication of the controversy." Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002) (quoting FED. R. CIV. P. 23(b)(3)).

The Self-Funded Plans and CareFirst claim on appeal that the District Court abused its discretion in certifying the class because the Self-Funded Plans represent a subclass whose interests differ from those of the insured Plans. Specifically, they contend that all self-funded Plans should have been represented by independent counsel because they were more damaged by Medco's conduct by virtue of paying Medco the entire cost of their beneficiaries' drugs and were more damaged by Medco's conduct as a result.

In determining whether "the representative parties will fairly and adequately protect the interests of the class," FED. R. CIV. P. 23(a)(4), a district court must determine whether "plaintiff's interests are antagonistic to the interest of other members of the class." In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 142 (2d Cir. 2001) (internal citations omitted); see also In re Drexel Burnham, 960 F.2d at 291. With respect to the adequacy of representation in this case, the District Court determined that:

> The record shows that all members of the class share a common interest in establishing that Medco violated ERISA. All members similarly wish to obtain the highest possible recovery.

24

The question is whether the insured or capitated [P]lans suffered the same injury or any injury at all. As insured funds, they paid the same premiums regardless of which type of drug Medco purchased for the account of their plan. It is highly unlikely that the Plans incurred any monetary damages as a result of Medco's activities as alleged by the drug interchange claim, which principally affects the self-funded [P]lans. However, to the extent that Medco was keeping rebates and breaching its fiduciary duties under ERISA as claimed by the Plaintiffs, those claims are equally meritorious and equally viable for the self-funded [P]lans and the insured [P]lans. For all these reasons, the Settlement Agreement balances the equities. It provides for the insured [P]lans' claims to be reduced to 55% as compared to the claims of the self-funded [P]lans. That the two different types of [P]lans might recover different amounts had they brought suit on their own, is insufficient to establish antagonistic interests among class members. This Court rejects the argument that Rule 23(a)(4) has not been satisfied.

In re: Medco Health Solutions, Inc., 2004 WL 1243873, at *7.

While we agree with the District Court that the Plans advanced similar theories of liability against Medco predicated on the same or similar facts, we are persuaded by the challenges to class certification raised by the Self-Funded Plans based upon the nature of their relationship with Medco. Self-funded Plans differ significantly from insured or capitated Plans because only self-funded Plans assumed the direct risk of absorbing any increases in prescription drug costs that were caused by Medco's conduct. They argue that since the insured and capitated Plans avoided that risk by paying set premiums, those Plans were not damaged and should receive no part of the settlement fund. The insured and capitated Plans nevertheless claim a substantial share in the fund, contending that if Medco had passed through rebates, "[t]he pass-throughs would have directly reduced the drug-acquisition costs of the self-funded plans, and indirectly reduced (through lower insurance premiums over time) the drug-acquisition costs of the [insured or] capitated plans." The insured or capitated Plans thus claim that Medco's failure to pass on savings damaged them financially.

In our view, this conflict among the Plans does not represent a simple disagreement over potential differences in the computation of damages, since the relationship of the Plans to Medco and its effect on each Plan goes to the very heart of the litigation. While we do not here decide whether the self-funded Plans in fact suffered greater injury, we think it proper to allow them to raise their claims as part of a separate subclass. The Self-Funded Plans dispute any recovery to the insured or capitated Plans, yet none of the class representatives is part of an exclusively self-funded plan that could adequately advance this position. Because the antagonistic interests apparent in the class should be adequately and independently represented, we remand to the District Court for certification of a subclass encompassing the self-funded plans in order to better protect their claims in this litigation. See Amchem Prods. v. Windsor, 521 U.S. 591, 604, 626 (1997) (holding that in a class action including both claimants who already had incurred an asbestos-related injury and claimants who merely had been exposed to asbestos, adequacy was not established because "the interests of those within the single class are not aligned [as] for the currently injured, the critical goal is generous immediate payments [, but for the] exposure-only plaintiffs [, there is an interest] in ensuring an ample, inflation-protected fund for the future"); Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 338, 340 (4th Cir. 1998) (holding that class certification was improper because "plaintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts" when there are "manifest conflicts of interest" in their claimed recovery); In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 801 (3d Cir. 1995) (holding that class certification was improper because the named plaintiffs "had no incentive to maximize the recovery" of the other class members in light of the disparity in settlement benefits).

## IV. Challenges to the Settlement Agreement

### A. Standard of Review

This Court has explained that "[a] district court's approval of the settlement of a class action is reviewable under an abuse-of-discretion standard." In re Ivan F. Boesky Sec. Litig., 948 F.2d 1358, 1368 (2d Cir. 1991). We review a district court's factual conclusions related to a settlement agreement under the clearly erroneous standard of review, and we review de novo a district court's legal conclusions with respect to its interpretation of the terms of a settlement agreement. Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 443 (2d Cir. 2005).

### B. Approval of the Settlement Agreement

The Self-Funded Plans contend that the District Court abused its discretion in approving the Settlement Agreement because it is ambiguous and does not adequately reflect the disparate damages suffered by the Self-Funded Plans as compared to insured or capitated Plans. Under FED. R. CIV. P. 23(e)(1)(C), "the court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate." In re Masters Mates & Pilots Pension Plan & IRAP Litig., 957 F.2d 1020, 1026 (2d Cir. 1992).

With respect to the Agreement's description of how class members calculate their proportionate share, the Agreement provides that allocation of funds "shall be made primarily on the basis of each settling [P]lan's proportionate share of the total drug spend of all settling plans." Although the Agreement does not specifically define the word "primarily," the Class Notice indicates that a Plan's "proportionate share of the total drug spend will be reduced by fifty-five percent (55%) to reflect the fact that [the] Plan could not have been damaged directly

27

by certain of the conduct that Plaintiffs allege increase costs to Plans." Read together, these provisions indicate that allocations will be calculated "primarily" on the basis of each Plan's proportionate share of the total drug spend, but that they will be reduced by 55% for insured or capitated Plans. This conclusion is supported by the explanation of the Plan of Allocation on the settlement website, which is incorporated by reference into the Class Notice and the contents of which appear in the record:

> The allocation will be made primarily on the basis of each setting plan's proportionate share of the total "drug spend" of all settling plans that timely file claims in the Settlement. However, the distribution for plans that did not participate in Medco Health's brand-to-brand therapeutic interchange program or that paid for the cost of prescription drugs primarily through an insurance or "capitated" arrangement will be reduced by 55%.

Medco ERISA Settlement Website, Frequently Asked Questions, How will the Settlement Fund be allocated (or how will the Settlement Fund be divided)?, http://completeclaimsolutions.com/ erisa settlment/faq_a.html (last visited May 17, 2007). In addition, while the Class Notice does not provide the "total drug spend" of the class, that figure is to be calculated by Medco after each Plan submits the attached Identification Form detailing its relationship with Medco during the class period. See Medco ERISA Settlement Website, Frequently Asked Questions, Who calculates my "drug spend"?, http://completeclaimsolutions. com/erisa settlment/faq_a.html (last visited May 17, 2007).

Moreover, the provisions of the Settlement Agreement explaining which claims are retained by the class are not misleading. The Agreement expressly provides that it does not release Medco or third-party administrators from any contract claims asserted by the parties. Medco indicated during the fairness hearing that "the contract claims are carved out and are not

released" by the Agreement and that it "agrees with settling counsel that none of the contract claims will be released for any of Medco's clients and no contract claims are preempted by ERISA." As the District Court aptly noted, "[t]he Amended Settlement Agreement is clear and it speaks for itself." In re: Medco Health Solutions, Inc., 2004 WL 1243873, at *8. We are, however, persuaded by the Self-Funded Plans' contention that the Agreement fails to adequately explain the allocation discount provided to the insured or capitated Plans. "[W]here, as here, the district court simultaneously certifies a class and approves a settlement of the action, we will more rigorously scrutinize the district court's analysis of the fairness, reasonableness and adequacy of both the negotiation process and the proposed settlement." In re Drexel Burnham, 960 F.2d at 292. Notwithstanding the lengthy negotiation process leading up to the Agreement upon which the District Court relied, In re: Medco Health Solutions, Inc., 2004 WL 1243873, at *8, there is no indication how the 55% allocation discount was calculated or why it properly reflects the relative losses suffered by the Plans. As even the District Court recognized, "[t]he [Class] Notice is silent as to how the proponents of the settlement derived the insured [P]lans' claim reduction of 55% relative to the claims of the self-funded [P]lans." Id. at *4.

Class members had different relationships with Medco that affected the extent to which they were damaged. The District Court's conclusion that the 55% discount to insured plans was fair, adequate, and reasonable did not rest on any specific factual findings or adequately explain how it accounted for the difference in these relationships. The District Court held simply that the Agreement "balances the equities" between self-funded and insured plans by providing the 55% allocation reduction for insured Plans. In re: Medco Health Solutions, Inc., 2004 WL 1243873, at *7. Although class counsel now attempt to rationalize the Plan of Allocation in their brief, we

29

do not have record evidence relating to the basis for the 55% reduction or the benefit of a more elaborate explanation of this discount by the District Court to allow us to determine whether it represents a fair, reasonable, and adequate discount.

In light of the foregoing, we conclude that the Settlement Agreement is not ambiguous as to how the class members calculate their proportionate shares in the fund, but we remand to the District Court for necessary findings and an explanation in support of any reduction in the shares of the insured or capitated Plans. We note that the new subclass containing only self-funded Plans will be better able to assert any challenge to the discount with the benefit of independent counsel. Since the Self-Funded Plans do not challenge on appeal, as they did in the District Court, the reasonableness of the size of the settlement fund, there is no need to renegotiate that aspect of the Settlement Agreement; the new subclass will be free on remand to negotiate only for a reallocation of the settlement proceeds, with any agreed change subject to the reasoned approval of the District Court.

V.      Attorneys' Fees

A.      Attorneys' Fees for Class Counsel

With respect to a district court's ruling on a fee application, "[w]hat constitutes a reasonable fee is properly committed to the sound discretion of the district court and will not be overturned absent an abuse of discretion, such as a mistake of law or a clearly erroneous factual finding." Goldberger v. Integrated Res., Inc., 209 F.3d 43, 47 (2d Cir. 2000) (internal citation omitted); see Jones v. Unum Life Ins. Co. of Am., 223 F.3d 130, 138 (2d Cir. 2000). The Supreme Court has held that when a representative plaintiff successfully establishes or protects a fund in which the other class members have a beneficial interest, the costs of litigation may be

30

distributed among the fund's beneficiaries. See Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 390–95 (1970). Moreover, under the "equitable fund" doctrine, attorneys for the successful party may petition for a portion of the fund as compensation for their efforts: "[A] litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980).

In common fund cases, courts typically use either the lodestar method or the percentage method to compute attorneys' fees. The lodestar method multiplies

> the numbers of hours expended by each attorney involved in each type of work on the case by the hourly rate normally charged for similar work by attorneys of like skill in the area and, once this base or lodestar rate is established, . . . [the court] determine[s] the final fee by then deciding whether to take into account other less objective factors, such as the risk of litigation, the complexity of the issues, and the skill of the attorneys.

Savoie v. Merchants Bank, 166 F.3d 456, 460 (2d Cir. 1999) (internal citations and quotation marks omitted). The percentage method, by contrast, calculates the fee award as some percentage of the settlement fund created for the benefit of the class. See Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007).

This Court has observed that the fee awarded must reflect "the actual effort made by the attorney to benefit the class" and that a court is "to act as a fiduciary who must serve as a guardian of the rights of absent class members." City of Detroit v. Grinnell Corp., 560 F.2d 1093, 1099 (2d Cir. 1977) (internal quotation marks omitted), abrogated on other grounds, Goldberger, 209 F.3d 43. Moreover, "[d]istrict courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: (1) the time and

31

labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . .; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." Goldberger, 209 F.3d at 50 (internal quotation marks omitted).

Applying these criteria, the District Court determined that the fee application requesting 30% of the settlement fund was reasonable. See In re: Medco Health Solutions, Inc., 2004 WL 1243873, at *11. The District Court applied the Goldberger test and made specific and detailed findings from the record, as well as from its own familiarity with the case, including the fact that counsel expended substantial time and effort in the litigation, that the case was litigated on a purely contingent basis, and that the fee award was 30% of the fund as permitted by the Settlement Agreement. See id. at *6–11. Accordingly, we find no reason to disturb the District Court's approval of class counsel's application.

We note in passing that counsel retained to represent the interests of the new subclass on remand also may be entitled to recover reasonable attorneys' fees. We leave it to the District Court's informed discretion to determine how to accommodate a fee claim by counsel for the subclass within the 30% cap provided in the Settlement Agreement.

B.    Attorneys' Fees for Cahn

With respect to Cahn's application for fees, the District Court held that:

[T]he efforts of Ms. Cahn did effectuate certain improvements in the Settlement Agreement which were ultimately of benefit to the class members, and . . . she is therefore entitled to a reasonable fee in the nature of quantum meruit, limited to the efforts actually directed towards achieving the benefits obtained. Equity requires fair treatment of one who confers a benefit, even where the actor has no standing and participates as an interloper or volunteer.

32

In re: Medco Health Solutions, Inc., 2004 WL 1243873, at *12. On appeal, Cahn claims that the District Court abused its discretion by awarding her a fee based upon the theory of quantum meruit instead of a percentage of recovery. We disagree.

The District Court correctly observed that Cahn was never the attorney for the plaintiff class or the attorney of record for any settling Plaintiff who belonged to the class. Cahn neither created the class action settlement nor induced Medco to accept it. Moreover, Cahn's "assistance was limited to fine tuning of provisions and documents after the Settlement had been agreed to in principle." Id. at *13. The District Court made extensive findings with respect to Cahn's time and efforts in the case and concluded that the majority did not ultimately benefit the settlement fund. Id. at *14. In light of the District Court's thorough analysis of Cahn's involvement in this case, we discern no abuse of discretion in the resulting award.

**CONCLUSION**

Based upon the foregoing, the judgment of the District Court is vacated insofar as it certified the class without creating a subclass of the self-funded Plans and approved the Settlement Agreement without setting forth the basis for the 55% allocation discount to insured or capitated Plans; and the case is remanded for certification of the subclass and for necessary findings and an explanation in support of any allocation discount. The judgment is affirmed in all other respects.