# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| IN RE WEWORK LITIGATION | ) Consolidated<br>) C.A. No. 2020-0258-AGB |

# MEMORANDUM OPINION

Date Submitted:  December 14, 2020
Date Decided:  December 14, 2020

William M. Lafferty, Kevin M. Coen, Sabrina M. Hendershot, and Sara Toscano, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, Delaware; Eric Seiler, Philippe Adler, and Mala Ahuja Harker, FRIEDMAN KAPLAN SEILER & ADELMAN LLP, New York, New York; William Christopher Carmody, Shawn J. Rabin, and Arun Subramanian, SUSMAN GODFREY L.L.P., New York, New York; *Attorneys for Plaintiffs Adam Neumann and We Holdings LLC.*

William B. Chandler, III, Brad D. Sorrels, Lori W. Will, Lindsay Kwoka Faccenda, Leah E. Brenner, and Jeremy W. Gagas, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; David J. Berger, Steven M. Guggenheim, and Dylan G. Savage, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; Michael S. Sommer, WILSON SONSINI GOODRICH & ROSATI, P.C., New York, New York; *Attorneys for the Special Committee of the Board of Directors of The We Company.*

Robert S. Saunders, Sarah R. Martin, and Arthur R. Bookout, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; George A. Zimmerman, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York; *Attorneys for The We Company.*

Elena C. Norman, Rolin P. Bissell, and Nicholas J. Rohrer, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Erik J. Olson, MORRISON & FOERSTER LLP, Palo Alto, California; James Bennett and Jordan Eth, MORRISON & FOERSTER LLP, San Francisco, California; *Attorneys for Defendant SoftBank Group Corp.*

Michael A. Barlow and E. Wade Houston, ABRAMS & BAYLISS LLP, Wilmington, Delaware; John B. Quinn and Molly Stephens, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California; *Attorneys for Defendant SoftBank Vision Fund (AIV M1) L.P.*

**BOUCHARD, Chancellor**

This decision resolves the motions of SoftBank Group Corp. and SoftBank Vision Fund (AIV M1) L.P. to dismiss the complaint of The We Company that was filed at the direction of a special committee of its board of directors (the "Special Committee") on April 7, 2020.[1]  For the reasons explained below, the motions brought under Rule 12(b)(1) for lack of standing will be denied and the motions brought under Rule 12(b)(6) for failure to state a claim for relief will be granted in part and denied in part.  More specifically, as to the Rule 12(b)(6) element of the motions, the claim for breach of contract survives in its entirety but the claim for breach of fiduciary duty will be dismissed in its entirety.

## I.  BACKGROUND

Unless otherwise noted, the facts recited in this opinion come from the Verified Complaint (the "Complaint") and documents incorporated therein.  Any additional facts are subject to judicial notice.

### A.  The Parties

Plaintiff The We Company ("WeWork" or the "Company") is a Delaware corporation headquartered in New York City that provides space solutions and

---

[1] As explained below in Part II, these motions were argued on July 21, 2020, but held in abeyance pending the court's adjudication of a separate motion to dismiss the Complaint that the Company filed under Court of Chancery Rule 41(a) at the direction of a new committee of the board of directors formed on May 29, 2020.  The court's decision on the Rule 41(a) motion is being issued simultaneously with this opinion, thus the reason for the submission date of this opinion.

1

related products and services.[2] WeWork was co-founded by Adam Neumann, who served as its CEO until September 24, 2019.[3] We Holdings LLC is a Delaware limited liability company of which Adam Neumann is a managing member. For simplicity, this decision refers to Adam Neumann and We Holdings together as "Neumann" and, when referring to Adam Neumann individually, as Mr. Neumann.

Defendant SoftBank Group Corp. ("SBG") is a publicly-traded, multinational conglomerate holding corporation incorporated under the laws of Japan and headquartered in Tokyo, Japan.[4] SBG is led by Masayoshi Son, its Chairman and CEO.[5] SBG has been heavily invested in WeWork since 2017, when it made an initial investment of $3 billion in the Company.[6]

Defendant Vision Fund (AIV M1) L.P. ("Vision Fund"), a Delaware limited partnership, is a $100 billion venture capital fund that was formed in 2017 following a conversation between Son and Saudi Crown Prince Mohammed bin Salman.[7] Vision Fund is an affiliate of SBG and is led by Son, who controls

---

[2] Verified Compl. ("Compl.") ¶ 23 (Dkt. 1).

[3] *Id.* ¶¶ 1, 37.

[4] *Id.* ¶ 25.

[5] *Id.*

[6] *Id.* ¶ 30.

[7] *Id.* ¶ 26.

Vision Fund's day-to-day operations along with other SBG executives.[8]  Vision Fund is primarily financed through investments from SBG, SBG executives, and Middle Eastern sovereign wealth funds.[9]  The Complaint at times refers to SBG and Vision Fund together as "SoftBank."

### B.    The MTA and the Stockholders' Agreement

In early October 2019, with the Company facing a liquidity crisis, the WeWork board of directors (the "Board") began to explore strategic options to avoid running out of cash.[10]  On October 12, 2019, the Board formed a special committee consisting of directors Bruce Dunlevie and Lewis Frankfort (the "Special Committee") to evaluate the options available to the Company, in particular debt financing arrangements that were underway with J.P. Morgan Chase & Co. ("J.P. Morgan") and a proposal from SBG.[11]

At the time SBG made its proposal to the Board, SBG and Vision Fund owned 27.1% of WeWork's equity on a fully-diluted basis and had designated two members to the Board.[12]  In appointing Dunlevie and Frankfort to the Special Committee, the Board determined that they were "free of any material conflict of

---

[8] *Id.*

[9] *Id.*

[10] *Id.* ¶ 36.

[11] *Id.* ¶¶ 38, 39.

[12] *Id.* ¶ 35.

3

interest" relating to a potential transaction involving SBG, Vision Fund, or Neumann.[13]

On October 22, 2019, the Company, SBG, Vision Fund, Mr. Neumann, and We Holdings LLC entered into a Master Transaction Agreement (the "MTA").[14] The MTA obligated SBG, subject to certain terms and conditions, to undertake three significant transactions: (i) provide the Company with $1.5 billion of equity financing (the "Equity Financing");[15] (ii) purchase up to $3 billion of the Company's stock from Neumann and other stockholders of the Company in a tender offer at a per share price no less than $19.19 (the "Tender Offer");[16] and (iii) provide the Company with up to $5.05 billion of debt financing (the "Debt Financing").[17]

The Tender Offer was subject to multiple closing conditions.[18] One such condition was the completion of a "roll up" of two of WeWork's joint ventures in Asia, known as PacificCo and ChinaCo (together, the "JV Roll-Ups").[19] After the

---

[13] *Id.* ¶ 24.

[14] *Id.* ¶ 43; *see* Compl. Ex. A ("MTA").

[15] MTA § 2.01.

[16] *Id.* § 3.01(a).

[17] *Id.* §§ 4.01(a)-(b).

[18] *See id.* § 3.01(a).

[19] Compl. ¶¶ 51, 53.

4

filing of this action, the condition concerning the "PacificCo Roll-Up" was satisfied.[20]

The "ChinaCo Roll-Up" involved a subsidiary of WeWork acquiring from Vision Fund shares in ChinaCo, a company WeWork used to conduct operations in China.[21] In exchange for these shares of ChinaCo, Vision Fund would receive WeWork shares.[22] The ChinaCo Roll-Up provided that "other equityholders" of ChinaCo "may participate in the JV Roll-Up."[23] To complete the ChinaCo Roll-Up, these minority investors had to either participate in the transaction or waive their first refusal and co-sale rights.[24]

The MTA contains provisions requiring the parties to use reasonable best efforts to complete the ChinaCo Roll-Up and satisfy other closing conditions. Section 8.03(a) of the MTA provides that SBG, Vision Fund, Neumann, and WeWork "shall . . . use their respective reasonable best efforts . . . to consummate and make effective as reasonably promptly as reasonably practicable after the date hereof . . . the Transactions."[25] The term "Transactions" includes the JV Roll-Ups

---

[20] *See* Mot. for Expedited Proceedings Hr'g Tr. at 12 (Apr. 17, 2020) (Dkt. 66); Mot. to Dismiss Hr'g Tr. at 61 (July 21, 2020) (Dkt. 242).

[21] MTA Ex. O (ChinaCo Share Purchase Agreement Term Sheet), at 1; Compl. ¶¶ 53, 71.

[22] MTA Ex. O, at 1; Compl. ¶¶ 53, 71.

[23] MTA Ex. O, at 1.

[24] *Id.* at 2; *see* Compl. ¶ 53.

[25] MTA § 8.03(a).

5

and the Tender Offer.[26]  Section 8.12 of the MTA requires SBG, Vision Fund, and WeWork to use their "reasonable best efforts . . . to negotiate and finalize the final forms of definitive JV Roll-Up Documents" no later than ten days after the funding of the Equity Financing.[27]  The term "JV Roll-Up Documents" includes a purchase agreement for the ChinaCo Roll-Up.[28]

The MTA also required the parties to enter into a stockholders' agreement (the "Stockholders' Agreement").[29]  The Stockholders' Agreement gave SBG and Vision Fund the right to designate five of the Company's ten directors, one of whom would be executive chairman of the Board.[30]  Neumann also executed a proxy, pursuant to the Stockholder's Agreement, giving voting control over his super-voting founder shares to the Board, which constitute 14.1% of the Company's equity on a fully-diluted basis.[31]  As a result of the MTA, SBG and Vision Fund owned approximately 43.4% and 8.9%, respectively, of WeWork's stock on a fully-diluted basis as of March 18, 2020.[32]

---

[26] *Id.* § 1.01.

[27] *Id*. § 8.12; *see* Compl. ¶ 54.

[28] MTA § 11.15.

[29] *See* MTA Ex. I ("Stockholders' Agreement").

[30] Compl. ¶ 44; Stockholders' Agreement §§ 2.01(b)(ii), 2.01(b)(v).

[31] Compl. ¶¶ 44, 60; Stockholders' Agreement § 5.08.

[32] *Id.*

## C. The Tender Offer, Trustbridge, and Amendment No. 1

In November 2019, SBG commenced the Tender Offer pursuant to an Offer to Purchase.[33] By this time, Son allegedly regretted his decision to invest in the Company.[34]

Also in November 2019, SoftBank began pursuing a transaction concerning ChinaCo, the terms and conditions of which allegedly were inconsistent with the prescribed ChinaCo purchase agreement.[35] Specifically, SoftBank pursued a transaction with Trustbridge Partners ("Trustbridge") which contemplated that Trustbridge, instead of WeWork, would acquire 51% of ChinaCo and assume operational control of ChinaCo.[36]

On or about December 26, 2019, Son and other SoftBank executives met in person with representatives of Trustbridge to pursue a proposed transaction with Trustbridge.[37] At this meeting, Son and other representatives of SoftBank gave Trustbridge reason to believe it would be against their interests to waive their ChinaCo first refusal and co-sale rights.[38] SoftBank also had discussions with

---

[33] *Id.* ¶ 4.

[34] *Id.* ¶ 7.

[35] *Id.* ¶ 66.

[36] *Id.*

[37] *Id.*

[38] *Id.* ¶ 67.

other ChinaCo minority investors to pressure them not to waive those rights, although the time frame of this discussions is not clear.[39]  As recently as March 4, 2020, "following instruction from SoftBank," Trustbridge wrote to the Company on behalf of various ChinaCo minority stockholders indicating that they would not waive their first refusal or co-sale rights.[40]

On December 27, 2019, the Company, Vision Fund, and SBG signed an amendment to the MTA ("Amendment No. 1").[41]  Amendment No. 1 altered the sequencing of the transactions in the MTA by permitting the Debt Financing to occur either before or after the closing of the Tender Offer.[42]  Amendment No. 1 also included an acknowledgement concerning the use of "reasonable best efforts" with respect to the JV Roll-Ups.[43]  Specifically, Section 5(b) of Amendment No. 1 states, as follows:

---

[39] *See id.*

[40] *Id.* ¶ 69.

[41] *See* Compl. Ex. B ("Amendment No. 1").

[42] *Id.* § 3.

[43] *Id.* § 5(b).

Each Party hereby acknowledges that the Company, SBG and [Vision Fund] caused their respective Affiliates to use reasonable best efforts to negotiate and finalize the final forms of definitive JV Roll-Up Documents, however, the JV Roll-Up Documents were not finalized within ten (10) days of the 1.5 Agreement Funding. The Company, SBG and [Vision Fund] will continue to cause their respective Affiliates to use reasonable best efforts in accordance with this Section 5.[44]

## D. Termination of the Tender Offer

In February 2020, Vision Fund informed the Special Committee that, "at the closing of the Tender Offer, it expected to receive the same ownership in the Company it was promised in the MTA, including as a result of the ChinaCo share exchange," and "that it was not interested in any other transaction."[45] After receiving this communication, in an effort to consummate the Tender Offer, the Special Committee proposed an amendment to the MTA that, among other things, would have allowed Vision Fund to retain its equity interest in ChinaCo while also receiving the same number of newly-issued shares of Series H preferred stock that Vision Fund would have received under the MTA upon completion of the ChinaCo Roll-Up, equivalent to about 8% of WeWork's stock.[46] Although Vision Fund

---

[44] *Id.*

[45] Compl. ¶ 71.

[46] *Id.* ¶ 72.

9

indicated it "found this proposal acceptable," the proposal ultimately was rejected.[47]

On March 17, 2020, in an amendment to the Offer to Purchase, SBG listed four conditions to the Tender Offer, including the ChinaCo Roll-Up, it claimed had not been satisfied and stated it would not be obligated to pay for any tendered shares if these conditions were not satisfied by April 1, 2020.[48] On April 1, 2020, SBG terminated the Tender Offer, asserting that certain closing conditions, including the ChinaCo Roll-Up, had not been satisfied.[49]

## II. PROCEDURAL HISTORY

On April 7, 2020, the Company, acting under the direction of the Special Committee, filed this action against SBG and Vision Fund. This action is sometimes referred to as the "MTA Litigation." The Complaint asserts two claims. Count I asserts that SBG and Vision Fund breached Sections 8.03 and 8.12 of the MTA by failing "to use reasonable best efforts to consummate the transactions contemplated by the MTA."[50] Count II asserts that SBG and Vision Fund breached

---

[47] *Id.* ¶¶ 72-73.

[48] *Id.* ¶¶ 74-75; Compl. Ex. D (Amendment to Offer to Purchase Equity Securities of The We Company).

[49] Compl. ¶ 77; Compl. Ex. C (Notice Regarding Termination and Withdrawal of Offer to Purchase Equity Securities of The We Company).

[50] Compl. ¶ 92.

fiduciary duties they owe to the Company and its minority stockholders as "the Company's controlling stockholder."[51]

On April 17, 2020 SBG and Vision Fund moved to dismiss the Complaint pursuant to Court of Chancery Rules 12(b)(1) and 12(b)(6).[52] After briefing, this motion was argued on July 21, 2020.

In the meantime, on May 4, 2020, Neumann filed a complaint against SBG and Vision Fund in a separate action (the "Neumann Complaint").[53] On May 28, 2020, the court entered an order consolidating the two actions for discovery and trial while maintaining separate pleadings for the different plaintiffs.[54] As amended, the Neumann Complaint asserts claims for breach of contract and breach of fiduciary duties similar to those asserted in the Complaint that was filed at the direction of the Special Committee.[55]

On May 29, 2020, the Company's board of directors, by a 6-2 vote, appointed two new directors to the board for two-month terms and appointed those directors to a committee (the "New Committee") to determine "whether the Special Committee has or should have . . . the authority to cause the Company to

---

[51] *Id.* ¶¶ 100-02.

[52] *See* Dkts. 30, 31.

[53] *See* C.A. No. 2020-0329-AGB.

[54] *See* Dkt. 109 ¶¶ 1, 4.

[55] *See generally* Verified Am. Compl. ¶¶ 70-90 (Dkt. 131).

11

commence and/or continue the MTA Litigation."[56]   On July 30, 2020, the

Company, acting at the direction of the New Committee, filed a motion for leave to

dismiss the Complaint under Court of Chancery Rule 41(a).[57]   This motion is

referred to as the "Rule 41(a) motion."

The Rule 41(a) motion was argued on October 16, 2020.  SBG and Vision

Fund's motions to dismiss the Complaint were held in abeyance until the court's

adjudication of the Rule 41(a) motion.  The court's opinion deciding the Rule 41(a)

motion is being issued simultaneously with this opinion.

On October 30, 2020, the court granted SBG's partial motion to dismiss the

fiduciary duty claim in the Neumann Complaint and granted in part and denied in

part Vision Fund's motion to dismiss the Neumann Complaint in its entirety.

Specifically, the court found that the Neumann Complaint stated a claim for breach

of the MTA against Vision Fund, but did not state a claim for breach of fiduciary

duty against SBG and Vision Fund because that claim was duplicative of the

breach of contract claim.[58]

---

[56] Martin Decl. Ex. 14 (May 29, 2020 Board Minutes), Annex Res-2 (May 29, 2020 Board Resolutions), at Skadden_ NewCommittee 0000016 (Dkt. 372).

[57] Dkt. 204.

[58] *See In re WeWork Litig.*, 2020 WL 6375438, at *1 (Del. Ch. Oct. 30, 2020). SBG did not seek to dismiss Neumann's breach of contract claim against it. *Id.* at *6.

## III. ANALYSIS

SBG and Vision Fund's motions to dismiss raise three issues. The first issue is whether the Company has standing to assert claims under the MTA relating to the Tender Offer. The standards relevant to this issue, which is governed by Court of Chancery Rule 12(b)(1), are addressed in Part III.A.

The second issue is whether Count I of the Complaint for breach of the MTA states a claim for relief against Vision Fund. The third issue is whether Count II of the Complaint for breach of fiduciary duty states a claim for relief against both SBG and Vision Fund. These issues are addressed in Parts III.B and III.C, respectively. The standards that apply to a motion under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[59]

### A. Does the Company Have Standing?

SBG and Vision Fund move under Court of Chancery Rule 12(b)(1) to dismiss the Complaint in is entirely for lack of jurisdiction over the subject

---

[59] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal quotation marks and citations omitted).

matter.[60]  "Standing is a threshold jurisdictional requirement."[61]  "Unlike the federal courts, where standing may be subject to stated constitutional limits, state courts apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are mere intermeddlers."[62]

Our Supreme Court has found that "[t]he requirements for Article III constitutional standing," as the United States Supreme Court explained them in *Lujan v. Defenders of Wildlife*,[63] "are generally the same as the standards for determining standing to bring a case or controversy within the courts of Delaware."[64]  "To establish standing, a plaintiff or petitioner must demonstrate first, that he or she sustained an 'injury-in-fact'; and second, that the interests he or she seeks to be protected are within the zone of interests to be protected."[65]  "Injury-in-fact is not Mount Everest."[66]  "The contours of the injury-in-fact

---

[60] *See* SBG Opening Br. 14 (Dkt. 84); Vision Fund Opening Br. 1 (joining SBG's standing arguments) (Dkt. 83).

[61] *Hall v. Coupe*, 2016 WL 3094406, at *3 (Del. Ch. May 25, 2016).

[62] *Dover Hist. Soc'y v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1111 (Del. 2003) (internal quotation marks omitted).

[63] 504 U.S. 555 (1992).

[64] *Dover Hist. Soc'y*, 838 A.2d at 1111.

[65] *Id.* at 1110.

[66] *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito, J.).

14

requirement, while not precisely defined, are very generous," requiring only that "a plaintiff has alleged some specific, identifiable trifle of injury."[67]

The burden of establishing subject matter jurisdiction is on the plaintiff.[68] "In deciding whether the plaintiff has met that burden, the Court need not accept the plaintiff's factual allegations as true and is free to consider facts not alleged in the complaint."[69]

SBG and Vision Fund contend that the Company—acting in this case at the direction of the Special Committee[70]—does not have standing to sue for alleged breaches of the MTA because the Company "was not injured when the Tender Offer was terminated."[71] SBG contends that the Tender Offer "only benefits

---

[67] *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982) (internal citations and quotation marks omitted).

[68] *Lewis v. AimCo Props., L.P.*, 2015 WL 557995, at *2 (Del. Ch. Feb. 10, 2015).

[69] *Shahin v. City of Dover*, 2018 WL 4635730, at *3 (Del. Ch. Sept. 26, 2018) (citing *Appriva S'holders Litig. Co. v. ev3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007)).

[70] This decision does not consider whether the Special Committee had the authority to act for the Company to assert a claim for breach of the MTA against SBG and Vision Fund. The court addresses that issue in a separate opinion issued simultaneously with this opinion in response to the Rule 41(a) motion the Company filed at the direction of the New Committee. This decision confines itself to determining whether the Company itself has standing to assert a claim for breach of the MTA against SBG and Vision Fund. Because the court concludes that the breach of fiduciary duty claim in Count II of the Complaint fails to state a claim for relief for the reasons explained in Part III.C, it does not address the standing issue with respect to that claim.

[71] SBG Reply. Br. 1 (Dkt. 165).

tendering stockholders," not the Company,[72] and that tendering stockholders can assert their own claims against SBG under the Offer to Purchase for its alleged failure to complete the Tender Offer.[73]

In response, the Company contends it has standing as a party to the MTA to sue for the alleged breaches of the MTA and "that the Company was the appropriate party to seek specific performance on behalf of itself and its stockholders."[74] More specifically, the Company contends it has standing to assert claims stemming from the Tender Offer as a "guardian of the minority stockholders with respect to the MTA" because "Delaware courts have long recognized that it is logical for companies to enforce the terms of agreements to which the company is a party and not rely on stockholders to do so."[75]

In its answering brief, the Company also contended that "the Company has suffered an injury" because SBG had failed to provide $1.1 billion of the Debt Financing required under the MTA, "which is contingent upon consummation of the Tender Offer."[76] This issue became moot on June 12, 2020, the same day the

---

[72] *Id.* at 9.

[73] *Id.* at 8 n.4, 16.

[74] WeWork Answering Br. 33 (Dkt. 132).

[75] *Id.* at 34-35.

[76] *Id.* at 24, 39.

16

Company filed its answering brief, when SBG "offered WeWork the [$1.1 billion] debt facility on the terms provided in the MTA."[77]

In connection with briefing on the Rule 41(a) motion, the Special Committee submitted a declaration from Robert M. Daines, the Priztker Professor of Law and Business and Associate Dean at Stanford Law School.[78] Professor Daines opines that the Company and all of its stockholders would benefit from consummation of the Tender Offer by increasing SBG and Vision Fund's combined equity ownership from approximately 52.3% to 77.9%.[79] Using Professor Daines' declaration for support, the Special Committee argues in its brief in opposition to the Rule 41(a) motion that this larger equity stake would increase SBG and Vision Fund's "incentive to increase Company value" by reducing agency costs and the risk that they "would benefit [themselves] at the expense of WeWork and minority stockholders."[80]

---

[77] SBG Reply. Br. 1.

[78] *See* Decl. of Robert M. Daines in Support of the Special Committee's Opp'n to The We Company's Mot. for Leave to Dismiss the Compl. Pursuant to Court of Chancery Rule 41(a) ("Daines Decl.") ¶ 5 (Dkt. 388).

[79] *Id.* ¶ 21.

[80] The Special Committee's Brief in Opp'n to The We Company's Mot. for Leave to Dismiss the Compl. Pursuant to Court of Chancery Rule 41(a) at 3, 37-38 (Dkt. 385) (citing Daines Decl. ¶¶ 35-37). As noted previously, the court may consider facts not alleged in the complaint when deciding a motion for lack of subject matter jurisdiction. *Shahin*, 2018 WL 4635730, at *3.

In my opinion, the Company has standing to sue SBG and Vision Fund for alleged breaches of the MTA related to the Tender Offer for essentially three reasons.

First, the Company is a party to the MTA. The MTA was "entered into by and among" the Company, SBG, Vision Fund, Mr. Neumann, and We Holdings LLC.[81] The MTA expressly defines each of these entities and Mr. Neumann as the "Parties" to the MTA.[82]

As our Supreme Court has stated: "It is a fundamental principle of contract law that the parties to a contract are bound by its terms, and have the corresponding right to enforce them."[83] Indeed, as numerous federal circuit courts have found, "[w]hen one party fails to honor its commitments, the other party to the contract suffers a legal injury sufficient to create standing *even where that*

---

[81] MTA at 1.

[82] *Id.*

[83] *NAF Hldgs., LLC v. Li & Fund (Trading) Ltd.*, 118 A.3d 175, 180-81 (Del. 2015) (Strine, C.J.); *see also* 17B C.J.S. Contracts § 935 (2020) ("In the absence of a provision in a contract specifically stating that it will inure to the benefit of a third person, parties to a contract are presumed to have contracted for themselves, or their own benefit, and not for the benefit of third parties.").

*party seems not to have incurred monetary loss or other concrete harm.*"[84] SBG

and Vision Fund have cited no case where a court found that a party to a contract

lacked standing to assert alleged breaches of that contract.

The MTA enumerates SBG and Vision Fund's obligations with respect to

the Tender Offer, including their obligation under Sections 8.03 and 8.12 of the

MTA to use their respective "reasonable best efforts" to satisfy various closing

---

[84] *J.P. Morgan Chase Bank, N.A. v. McDonald*, 760 F.3d 646, 651 (7th Cir. 2014) (emphasis added) (citing *Hydrite Chem. Co. v. Calumet Lubricants Co.,* 47 F.3d 887, 891 (7th Cir.1995) and 3 E. Allan Farnsworth, Farnsworth on Contracts § 12.8, p. 189 (2004)); *see also  Carlsen v. GameStop, Inc.*, 833 F.3d 903, 909 (8th Cir. 2016) ("Our court previously has held that a plaintiff who has produced facts indicating it was a party to a breached contract has a judicially cognizable interest for standing purposes, regardless of the merits of the breach alleged." (internal quotation marks omitted)); *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012) (Stating that "[t]he invasion of a common-law right (including a right conferred by contract) can constitute an injury sufficient to create standing" and noting that "when a plaintiff generally alleges the existence of a contract, express or implied, and a concomitant breach of that contract, her pleading adequately shows an injury to her rights"); *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 960 (8th Cir. 2011) ("None of YRC's cases denied standing to a plaintiff that produced facts indicating it was a party to a breached contract. Here, ABF signed an agreement with the Union, which purports to make it a signatory to the NMFA. . . . Whatever the merits of these points, ABF has produced sufficient facts, for standing purposes, indicating a judicially cognizable interest in the NMFA."); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 242-43 (2d Cir. 2007) ("We reject the Self–Funded Plans' claim that Janazzo must establish specific financial harm before her Plan has standing, since it conflates a defense to the merits of the Plan's claim against Medco with the requirement to make a threshold jurisdictional showing.  In our view, the foregoing evidence supports the District Court's determination that Janazzo's Plan was involved in a contractual relationship with Medco so as to give her standing."); *Castle v. United States*, 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("We conclude that only Castle and Harlan have standing to sue for breach of the alleged contract because only Castle and Harlan signed any document constituting the alleged contract.").

conditions. Other provisions of the MTA support WeWork's standing as a party to the MTA to sue for breach of these "reasonable best efforts" provisions. Section 11.06—titled "No Third-Party Beneficiaries"—provides, with certain exceptions not relevant here, that the MTA "is for the sole benefit of *the Parties* . . . and nothing herein, express or implied, shall give or be construed to give to any Person . . . any legal or equitable rights hereunder."[85] Section 11.10 further provides in relevant part that:

> *The Parties* agree that in the event that any of the Transactions are not consummated in accordance with the terms of this Agreement or the other Transaction Agreements, . . . irreparable damage would occur, no adequate remedy at Law would exist and damages would be difficult to determine. Accordingly, *the Parties* acknowledge and agree that *the Parties* shall be entitled to an injunction, specific performance or other equitable relief to prevent breaches or threatened breaches of this Agreement and the other Transaction Agreements and to enforce specifically the terms and provisions of this Agreement and the other Transaction Agreements, in addition to any other remedy at Law or in equity.[86]

The plain language of these provisions reflect the shared intent of the Parties to the MTA that the Company would have the right to seek specific performance under the MTA to remedy a breach of SBG and Vision Fund's obligations with respect to the "Transactions," which expressly includes the Tender Offer.[87]

---

[85] MTA § 11.06 (emphasis added).

[86] *Id.* § 11.10 (emphasis added).

[87] *Id.* § 1.01.

Second, "injury-in-fact" is not limited "to those who could show economic harm."[88] It thus is of no moment that the Company will not receive the proceeds of the Tender Offer. The bargain struck in the MTA was that SBG, subject to specified conditions, would invest a total of approximately $9.5 billion in WeWork—not $6.5 billion—with $3 billion of the total amount attributable to the Tender Offer. The ability of the Company—as a Party to the MTA—to seek specific performance to enforce SBG and Vision Fund's obligations to use their reasonable best efforts to consummate the Tender Offer is critical to ensure that the Company receives all the benefits in the MTA to which it is entitled, including the benefit of having SBG deeply committed to the success of WeWork in connection with the transfer of control of the Company from Neumann to SBG and Vision Fund.

To that end, the Special Committee submitted evidence in the form of an expert opinion that consummation of the Tender Offer not only would benefit minority stockholders who receive payment for some of their shares, but also would benefit the Company and all its stockholders by materially increasing SBG's stake in WeWork, which would reduce agency costs and increase SBG's incentive

---

[88] *United States v. SCRAP*, 412 U.S. 669, 686 (1973).

21

to enhance the value of the Company.[89] The New Committee itself found that closing the Tender Offer could provide a benefit to the Company, albeit a "relatively small" benefit, in the form of improved employee morale and retention by providing employees who tendered shares into the Tender Offer liquidity at an attractive price.[90]

Third, given the disclaimer of third-party beneficiary rights in Section 11.06 of the MTA, none of the stockholders who tendered shares into the Tender Offer (other than Mr. Neumann and his affiliated entity who are parties to the MTA) would have standing to enforce the "reasonable best efforts" provisions of the MTA, including the right to seek the equitable remedy of specific performance for breach of those provisions based on the stipulation in Section 11.10 of the MTA.

---

[89] Daines Decl. ¶¶ 35-37; *see also* Lucian A. Bebchuck & Kobi Kastiel, *The Perils of Small-Minority Controllers*, 107 Geo. L.J. 1453, 1465 (2019) ("Conversely, whereas a majority owner cannot be replaced and would not be disciplined by the market for corporate control, *her large equity stake in the controlled company provides powerful financial incentives to maximize company value*." (emphasis added)); *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *2 (Del. Ch. Jan. 25, 2016) ("The basic insight is a simple one: by virtue of its control over the firm, the controller can direct how that firm deploys its capital. As an equity owner, the controller participates in the resulting benefits (and losses) in proportion to its equity stake, effectively gaining or losing on a *pro rata* basis with other stockholders. By contrast, in a related-party transaction, the controller receives 100% of the benefit while only funding the payment to the extent of its equity stake. The balance of the payment is funded by the unaffiliated equity holders. The economic incentive to tunnel varies inversely with the controller's equity stake. *All else equal, as the controller's equity stake declines, the relative benefit from a direct payment increase*.") (emphasis added).

[90] *See* Martin Decl. Ex. 15 (Report of the New Committee of the Board of Directors of The We Company), at 42-43.

This outcome is untenable "[a]s equity will not suffer a wrong without a remedy."[91]

Noting that "[a] tender offer creates a contract with the tendering party," SBG and Vision Fund argue that "[t]endering stockholders can sue to enforce that contract."[92]  In advancing this argument, SBG and Vision Fund assert that "[w]hether or not tendering stockholders' rights under the Offer to Purchase are identical to terms included in the MTA is irrelevant."[93]  The court disagrees.

SBG and Vision Fund have not cited any principle of law or equity—and the court is aware of none—to support the notion that a party to a contract can avoid accountability for its contractual obligations based on the availability of an alternative theory of liability, particularly one that appears less potent.  Putting aside the complexity of determining *ab initio* all the issues that may arise in enforcing a claim under the express or implied terms of the Offer to Purchase and the differences between such a claim and a direct claim for breach of the MTA, it

---

[91] *Fischer v. Fischer*, 1999 WL 1032768, at *4 (Del. Ch. Nov. 4, 1999).

[92] SBG Opening Br. 20.

[93] SBG Reply. Br. 8.

appears that such a claim would have at least two distinct disadvantages.[94]  One disadvantage is that, unlike under the MTA, a tendering stockholder could not sue Vision Fund for breach of a "reasonable best efforts" obligation under the Offer to Purchase because it was not an offeror in the Tender Offer.[95]  A second disadvantage of being constrained to the terms of the Offer to Purchase is that tendering stockholders would not be able to utilize SBG and Vision Fund's stipulation in Section 11.10 of the MTA that the failure to consummate the Tender Offer in breach of the MTA would constitute irreparable harm and provide a putative entitlement to specific performance.[96]

---

[94] Further complicating the ability to make such an assessment, SBG has been coy about what rights a tendering stockholder would have for breach of the Offer to Purchase.  The Offer to Purchase does not include the "reasonable best efforts" provisions set forth in the MTA.  In briefing this motion, SBG did not expressly acknowledge that all tendering stockholders could assert a claim under the Offer to Purchase equivalent to a claim under the MTA for breach of its reasonable best efforts provisions but stated instead, rather elliptically, that "[i]f Neumann proves that SBG failed to use reasonable best efforts, tendering stockholders would necessarily benefit in any consolidated trial."  SBG Reply Br. 8 n.4.  It was not until several months later, on October 13, 2020, that SBG expressly stated "its position that, under the [Offer to Purchase], SBG has an implied obligation to take reasonable best efforts equal to its obligations under the MTA's express obligations."  Dkt. 398 at 2.

[95] *See Gilbert v. El Paso Co.*, 490 A.2d 1050, 1054 (Del. Ch. 1984) (explaining that "[a] tender offer results in formation of a contract" between the offeror and offerree).

[96] *See* MTA § 11.10.

24

For the reasons explained above, the court finds that the Company has met its burden of establishing standing. Accordingly, SBG and Vision Fund's motion to dismiss the Complaint under Court of Chancery Rule 12(b)(1) will be denied.

## B. The Breach of Contract Claim

Count I of the Complaint asserts that SBG and Vision Fund breached Sections 8.03 and 8.12 of the MTA by failing "to use reasonable best efforts to consummate the transactions contemplated by the MTA, including the Tender Offer and the roll-up of ChinaCo."[97] SBG did not move to dismiss Count I for failure to state a claim for relief, tacitly conceding the viability of the Company's contract claim against it.

To establish a claim for a breach of contract under Delaware law, "a plaintiff must prove: (1) the existence of a valid and enforceable contract; (2) that the defendants breached the contract; and (3) that the plaintiff was damaged as a result of those breaches."[98] Vision Fund only challenges the second element, arguing that its alleged breach of the "reasonable best efforts" clauses of the MTA are not reasonably conceivable.[99]

---

[97] Compl. ¶ 92.

[98] *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *8 (Del. Ch. Apr. 27, 2009).

[99] *See* Vision Fund Opening Br. 12; Vision Fund Reply Br. 12 (Dkt. 166).

Sections 8.03(a) and 8.12 of the MTA each required both SBG and Vision Fund to use reasonable best efforts to complete the ChinaCo Roll-Up and to satisfy other conditions to close the Tender Offer. Specifically, Section 8.03(a) of the MTA states, in relevant part:

> The Company, SBG, [Vision Fund], [and Neumann] shall . . . use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and assist and cooperate with the other Parties in doing, all things necessary, proper or advisable . . . to consummate and make effective as reasonably promptly as reasonably practicable after the date hereof . . . the Transactions. . . .[100]

The MTA defines the term "Transactions" to include the Tender Offer.[101]

Similarly, Section 8.12 required the Company, SBG, and Vision Fund "to use reasonable best efforts to negotiate and finalize the final forms of definitive JV Roll-Up Documents by the [Equity Financing] Funding (and in any event no later than the tenth (10th) day following the date of the [Equity Financing] Funding)."[102]

Under Delaware law, reasonable best efforts clauses "impose obligations to take all reasonable steps to solve problems and consummate the transaction."[103] "When evaluating whether a merger partner has used reasonable best efforts, this court has looked to whether the party subject to the clause (i) had reasonable

---

[100] MTA § 8.03(a).

[101] *Id.* § 1.01.

[102] *Id.* § 8.12.

[103] *Williams Cos. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272 (Del. 2017).

grounds to take the action it did and (ii) sought to address problems with its counterparty."[104]

The Complaint alleges, among things, that "SoftBank"—which is defined to include SBG and Vision Fund—"pursue[d] an alternative financing transaction with Trustbridge" that was "inconsistent with the roll-up of ChinaCo required by the MTA"[105] and that SoftBank "had discussions with other ChinaCo minority investors to pressure them not to waive" their first refusal and co-sale rights.[106]

Vision Fund contends that the Company's breach of contract claim should be dismissed under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief on the theory that the Complaint's "allegations specific to Vision Fund establish that it affirmatively tried to facilitate the closing of the JV Roll-Up transactions, which was the only Tender Offer Condition that implicated Vision Fund."[107] As to the ChinaCo Roll-Up, which is the only JV Roll-Up at issue,[108] Vision Fund relies on a single paragraph in the 104-paragraph Complaint. Specifically, Vision Fund points to paragraph 72 of the Complaint, which states

---

[104] *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *91 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018).

[105] Compl. ¶ 66.

[106] *Id.* ¶ 67.

[107] Vision Fund Opening Br. 14.

[108] *See supra* Part I.B.

27

that Vision Fund at one point found "acceptable" an amendment to the MTA that the Special Committee proposed to try to consummate the Tender Offer.[109] The proposed amendment, which ultimately was rejected, would have allowed Vision Fund to retain its equity interests in ChinaCo while also receiving the shares of WeWork (about 8% percent of the Company's stock) it would have received under the MTA upon completion of the ChinaCo share exchange.[110]

The fundamental problem with Vision Fund's argument is that it asks the court to ignore "contradictory allegations" in the Complaint and to rely on a single allegation that Vision Fund views as "exculpatory" and that it believes "defeats" the other allegations.[111] This is impermissible. The court may not resolve material factual disputes or weigh evidence on a motion dismiss.[112]

Accepting as true all the well-pleaded factual allegations of the Complaint and drawing all reasonable inferences in favor of the Company at this stage of the case, as the court must, the narrative of the Complaint is that "SoftBank" (*i.e.*, SBG and Vision Fund) schemed to thwart the ChinaCo Roll-Up in breach of their

---

[109] *See* Vision Fund Opening Br. 8, 12, 14, 15, 23 (citing Compl. ¶ 72).

[110] Compl. ¶ 72.

[111] *See* Vision Fund Reply Br. 9; Vision Fund Opening Br. 15.

[112] *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001) ("Because a motion to dismiss under Chancery Rule 12(b)(6) must be decided without the benefit of a factual record, the Court of Chancery may not resolve material factual disputes; instead, the court is required to assume as true the well-pleaded allegations in the complaint.").

reasonable best efforts obligations in order to avoid closing the Tender Offer.[113] The well-plead allegations to that effect include SoftBank's pursuit of an alternative transaction with Trustbridge, the terms and conditions of which "were inconsistent with the roll-up of ChinaCo required by the MTA"; discussions that Son and other representatives of SoftBank had with Trustbridge and other ChinaCo minority investors to pressure them not to waive their first refusal and co-sale rights; and rejection of the Special Committee's proposed amendment itself.[114]

Vision Fund protests that the Complaint wrongfully "lump[s] together" Vision Fund and SBG by using the defined term "SoftBank" to refer to both entities and contends that this "failure . . . alone requires dismissal of the breach of contract claim against Vision Fund."[115] The court disagrees. Although group pleading is generally disfavored, the Complaint's use of the term "SoftBank" to capture both SBG and Vision Fund was justified here given the close relationship between these entities plead in the Complaint. Specifically, the Complaint alleges that Vision Fund is an affiliate of SBG and that Son—who leads both SBG and Vision Fund—controls Vision Fund's day-to-day operations along with other SBG

---

[113] *See* Compl. ¶¶ 63, 66-69, 94.

[114] *See id.* ¶¶ 66-69, 73.

[115] Vision Fund Opening Br. 13.

executives.[116]   Given these close-knit relationships, it understandably would be difficult to discern whether Son and other SBG executives were wearing their SBG or Vision Fund "hat" or both "hats" at given points in time.   On a motion to dismiss, the court cannot make such capacity determinations, which must await the development of a factual record after discovery.[117]

In sum, as this court explained in denying Vision Fund's motion to dismiss the contract claim asserted against it in the Neumann Complaint, "[d]etermining whether a party used reasonable best efforts is an inherently factual inquiry that is not readily amenable to resolution at the pleadings stage."[118]   Here, just because Vision Fund is alleged to have been amenable at one point to amending the MTA to facilitate the Tender Offer does not rule out that it failed to use its reasonable efforts to complete the ChinaCo Roll-Up and to close the Tender Offer in other respects.   To the contrary, based on the overall narrative alleged in the Complaint, it is reasonably conceivable that Vision Fund breached its reasonable best efforts

---

[116] Compl. ¶ 26.

[117] *See Voigt v. Metcalf*, 2020 WL 614999, at *28 (Del. Ch. Feb. 10, 2020) (declining at the pleadings stage to make the "capacity determination" that certain individuals were acting solely as representatives of an alleged controller rather than as directors of a controlled entity because that "would require drawing inferences in favor of the defendants, rather than the plaintiff.").

obligations in Sections 8.03(a) and 8.12 of the MTA.[119]  Accordingly, Vision

Fund's motion to dismiss Count I of the Complaint is denied.

## C.    The Fiduciary Duty Claim

Count II of the Complaint asserts that "SoftBank has repeatedly used its

influence over the Company to limit the Company's options and force it into

favorable outcomes for SoftBank, to the detriment of the Company's minority

stockholders" in breach of its fiduciary duties as the "Company's controlling

---

[118] *In re WeWork Litig.*, 2020 WL 6375438, at *9 (Del. Ch. Oct. 30, 2020) (citing *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2013 WL 5787958, at *6 (Del. Ch. Oct. 25, 2013), *Crum & Crum Enters., Inc. v. NDC of Cal., LP*, 2010 WL 4668456, at *5 (D. Del. Nov. 3, 2010), and *Brown v. Buschman Co.*, 2002 WL 389139, at *85 (D. Del. Mar. 12, 2002)).

[119] Amendment No. 1 to the MTA "acknowledges that the Company, SBG and [Vision Fund] caused their respective Affiliates to use reasonable best efforts to negotiate and finalize the final forms of definitive JV Roll-Up Documents."  Amendment No. 1 § 5(b). Based on this provision, Vision Fund argues in its reply brief that the Company should be foreclosed from maintaining a contract claim against Vision Fund "based on the pre-December 27, 2019 discussions in which Mr. Son is alleged to have participated."  Vision Fund Reply Br. 6-7.  The court disagrees.  First, this argument was not made fairly in Vision Fund's opening brief, which mentions the acknowledgement in Amendment No. 1 once in a footnote that cannot fairly be read to be a ground for dismissal.  *See* Vision Fund Opening Br. 15 n.4; *Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *4 (Del. Ch. Oct. 19, 2006) ("Under the briefing rules, a party is obliged in its motion and opening brief to set forth all of the grounds, authorities and arguments supporting its motion.  A movant should not hold matters in reserve for reply briefs.") (internal citation omitted); *In re Asbestos Litig.*, 2007 WL 2410879, at *4 (Del. Super. Aug. 27, 2007) (same).  Second, the Complaint pleads that the discussions in question took place "on or about December 26, 2019," thus discovery is necessary to determine the actual timing of these events.  Compl. ¶ 66.  Third, it is unclear who authorized Amendment No. 1 on behalf of the Company, whether the Company was fully-informed about the relevant discussions at that time, and whether an "acknowledgment" would have preclusive effect.

31

stockholder."[120]  Unlike the Neumann Complaint, which asserted that SBG and Vision Fund owed fiduciary duties only after entering into the MTA, the Company asserts that SBG and Vision Fund owed fiduciary duties both before and after entering into the MTA.

SBG and Vision Fund advance essentially three arguments for why Count II fails to state a claim for relief.  First, they argue the allegations of the Complaint are insufficient to establish the existence of a "control group" between SBG and Vision Fund at any time.[121]  Second, with respect to the pre-MTA period, they contend they did not owe fiduciary duties to WeWork and its stockholders because "it is undisputed" that Neumann "controlled the Company" during this period.[122]  Third, with respect to the post-MTA period, they assert that the breach of fiduciary duty claim in the Complaint simply duplicates the contract claim in the Complaint.[123]

"[A] stockholder could be found a controller under Delaware law:  where the stockholder (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but '*exercises*

---

[120] Compl. ¶¶ 100, 102.

[121] *See* Vision Fund Reply Br. 22-26; SBG Reply Br. 26.

[122] Vision Fund Reply Br. 28; *see also* SBG Reply Br. 25-26.

[123] *See* Vision Fund Reply Br. 12-16; SBG Reply Br. 23, 29-31.

*control* over the business affairs of the corporation.'"[124]  "The requisite degree of control can be shown to exist generally or with regard to the particular transaction that is being challenged."[125]  There are many ways to demonstrate actual control over a particular decision:

> It is impossible to identify or foresee all of the possible sources of influence that could contribute to a finding of actual control over a particular decision. Examples include, but are not limited, to: (i) relationships with particular directors that compromise their disinterestedness or independence, (ii) relationships with key managers or advisors who play a critical role in presenting options, providing information, and making recommendations, (iii) the exercise of contractual rights to channel the corporation into a particular outcome by blocking or restricting other paths, and (iv) the existence of commercial relationships that provide the defendant with leverage over the corporation, such as status as a key customer or supplier.[126]

Our law also "recognizes that multiple stockholders together can constitute a control group exercising majority or effective control, with each member subject to the fiduciary duties of a controller,"[127] as follows:

---

[124] *Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 251 (Del. 2019) (quoting *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014)) (alteration in original).

[125] *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 659 (Del. Ch. 2013) (internal quotation marks omitted).

[126] *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC,* 2018 WL 3326693, at *26 (Del. Ch. July 6, 2018) (internal citations omitted).

[127] *Sheldon*, 220 A.3d at 251.

To demonstrate that a group of stockholders exercises control collectively, the Appellants must establish that they are connected in some legally significant way—such as by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal. To show a legally significant connection, the Appellants must allege that there was more than a mere concurrence of self-interest among certain stockholders. Rather, there must be some indication of an actual agreement, although it need not be formal or written.[128]

With the above principles in mind, the court considers the Complaint's breach of fiduciary allegations with respect to the pre-MTA and post-MTA periods, in turn, next.

### 1.    The Fiduciary Duty Claim Pre-MTA

The Company argues that SBG and Vision Fund together "exerted control over the Company prior to the execution of the MTA" through their "significant equity and debt positions and control over the Company's financing, the many financial relationships with Mr. Neumann and the Board, and its ability to direct the actions of the Company."[129]  SBG and Vision Fund counter that the fiduciary duty claim must be dismissed for the pre-MTA period because they were not controlling stockholders and thus did not owe fiduciary duties to WeWork during this period.[130]

---

[128] *Id.* at 251-52 (internal quotation marks and citations omitted).

[129] WeWork Answering Br. 49-50.

[130] *See* Vision Fund Reply Br. 28-30; SBG Reply Br. 25-26.

As an initial matter, the Company's contention that SBG and Vision Fund exerted control over WeWork pre-MTA is inconsistent with documents quoted in and submitted with its brief, namely minutes of an October 12, 2019 Board meeting and resolutions the Board approved that day to create the Special Committee, which negotiated the terms of the MTA.[131] The Board minutes acknowledge "*the status of Mr. Neumann as the controlling stockholder* of the Company" before the MTA was executed.[132] The resolutions recite that SBG's proposal—which became the transaction documented in the MTA—"*would result in SoftBank acquiring majority economic ownership and voting control of the Company.*"[133]

With respect to SBG and Vision Fund's equity position and board representation in the Company pre-MTA, the Complaint alleges only that they "held approximately 27.1% of the Company's stock on a fully-diluted basis and

---

[131] *See* WeWork Answering Br. 13 ("Because SoftBank's proposal 'would result in SoftBank acquiring majority economic ownership and voting control of the Company,' and also contemplated that Mr. Neumann would receive benefits from SoftBank not offered to other shareholders, the Board formed an independent committee to evaluate the strategic alternatives available to the Company.") (quoting Will Decl. Ex. M (Minutes of the Board of Directors of The We Company dated October 12 and 13, 2019 with Board Resolutions) (Dkt. 132)).

[132] Will Decl. Ex. M (emphasis added).

[133] *Id.* (emphasis added); *See also* The Special Committee's Brief in Opp'n to The We Company's Mot. for Leave to Dismiss the Compl. Pursuant to Court of Chancery Rule 41(a) at 1 ("There is no dispute that [SBG and Vision Fund] *gained control* of The We Company . . . through the Master Transaction Agreement.") (emphasis added).

had designated two members of the Board."[134]  These allegations are insufficient to support a reasonable inference that SBG and Vision Fund held a control position in the Company, separately or together.  Missing from the Complaint are any allegations concerning SBG and Vision Fund's individual or combined *voting power* or the total number of Board members pre-MTA.  Without this information, the court has no context from which it can reasonably infer that SBG and/or Vision Fund could dictate the outcome of board or stockholder action.  Also missing from the Complaint are any allegations that SBG and/or Vision Fund formed a control group pre-MTA with Mr. Neumann, who was recognized as the Company's "controlling stockholder" at that time in the October 12, 2019 Board minutes.[135]

In response to the selective information alleged in the Complaint, SBG submitted (i) a copy of a Stockholders' Agreement, dated July 15, 2019, by and among the Company and various stockholders[136] and (ii) a declaration from Christopher C. McKinnon, corporate counsel of a wholly-owned subsidiary of

---

[134] Compl. ¶ 35.

[135] *See Almond for Almond Family 2001 Tr. v. Glenhill Advisors LLC*, 2018 WL 3954733, at \*26 (Del. Ch. August 17, 2018) (explaining that "for a preexisting controlling stockholder to become part of a 'control group' with other stockholders, the preexisting controlling stockholder would have to agree to share with other stockholders, or impose limitations on, its own control power (such as through a voting agreement) for some perceived advantage as part of a legally significant relationship with the other stockholders."), *aff'd*, 224 A.3d 200 (Del. 2019).

[136] *See* SBG Reply Br. Ex. 1 (July 15, 2019 Stockholders' Agreement).

SBG, to which is attached a capitalization table showing the economic and voting interests of WeWork by major stockholders as of October 21, 2019, the day before the MTA became effective.[137] The Stockholders' Agreement reflects that SBG had the right to designate one of nine members of the Board.[138] In his declaration, McKinnon attests, based on "personal knowledge of and access to records reflecting equity ownership in WeWork by SBG and other parties," that:

> As of October 21, 2019, Adam Neumann (individually and jointly through his controlling position in We Holdings LLC) controlled approximately 75% of the voting interests in the company on an outstanding basis. SBG owned approximately 12% of economic interests in WeWork on a fully diluted basis, which yielded approximately 3.1% voting interests of WeWork on an outstanding basis. Vision Fund owned approximately 15% of economic interests on a fully-diluted basis, which yielded approximately 3.9% of voting interests on an outstanding basis.[139]

The court takes judicial notice of this information, which comes "from sources whose accuracy cannot reasonably be questioned."[140]

---

[137] McKinnon Decl. ¶¶ 1-2 (Dkt. 165).

[138] SBG Reply Br. Ex. 1 § 2.01(b)(ii)(C).

[139] McKinnon Decl. ¶¶ 2-3.

[140] D.R.E. 201(a)(2). Even if the court disregarded this information, it would reach the conclusion that the Company failed to allege facts to support a reasonable inference SBG and Vision Fund held a control position in the Company, separately or together, based on their equity interests and board representation because of the lack of well-plead allegations providing context to understand the significance of (i) holding 27.1% of the Company's stock on a fully-diluted basis without knowing the voting power associated with those shares and (ii) having two Board designees without knowing how many directors were on the Board at the time.

37

Apart from focusing on SBG and Vision Fund's equity interests in WeWork and representation on its Board, the Company argues that SBG and Vision Fund used their "negative control position to advantage itself" by "threatening not to fund its $1.5 billion Warrant if the Company proceeded with J.P. Morgan's debt financing."[141] The referenced warrant dates back to January 2019, when "SoftBank entered into a mandatory warrant agreement with WeWork pursuant to which it agreed to provide another $1.5 billion in financing in exchange for additional shares in the Company at a price of $110 per share (the 'Warrant')."[142] According to the Company, SBG and Vision Fund made this threat "to force the Company to agree to the MTA."[143] In support of this argument, the Company primarily relies on this court's decisions in *Basho Technologies Holdco B, LLC v. Georgetown Basho Investors, LLC*[144] and *Voigt v. Metcalf*.[145]

In *Basho*, an investor (Georgetown) in Basho Technologies, Inc. held a majority of a certain series of preferred stock with rights that "gave it the ability to block the Company from raising capital through equity financings."[146] The court

---

[141] WeWork Answering Br. 52.

[142] Compl. ¶ 32.

[143] WeWork Answering Br. 50.

[144] 2018 WL 3326693.

[145] 2020 WL 614999.

[146] *Basho*, 2018 WL 3326693, at *29.

found after trial that "Georgetown exercised effective control over Basho" concerning a financing transaction through "use of its contractual rights to channel the Company into a position where it had no options other than to accept Georgetown's terms" while also taking actions to "spread misinformation" and "manipulate the fundraising process."[147]

In *Voigt,* a private equity firm (CD&R) held 34.8% of the voting power of NCI Building Systems, Inc., had four designees on its twelve-person board, "relationships of varying significance with another four directors," and "contractual veto rights over a wide range of actions that the Board could otherwise take unilaterally."[148] The court found at the pleadings stage that "[t]hese blocking rights weigh in favor of an inference that CD&R exercised control over the Company generally by giving CD&R power over the Company beyond what the holder of a mathematical majority of the voting power ordinarily could wield."[149]

Here, unlike in *Basho* or *Voigt*, the Complaint does not plead facts sufficient to support a reasonable inference that SBG and/or Vision Fund had any contractual veto or blocking rights "to channel [the] corporation into a particular outcome by

---

[147] *Id.* at *28.

[148] *Voigt*, 2020 WL 614999, at *1.

[149] *Id.* at *19.

blocking other paths."[150] Accepting as true the allegations of the Complaint, SBG engaged in hardball negotiating tactics by threatening not to fund the Warrant in breach of its contractual obligations.[151] That alleged threat, which is the stuff of a litigation claim, is insufficient to support a reasonable inference that SBG and/or Vision Fund had the power to exercise control over the Company to force it to enter into the MTA. In sum, the Complaint fails to allege facts sufficient to support a reasonable inference that SBG and Vision Fund had the voting power, level of Board representation, contractual rights, or any other source of power to impose its will unilaterally and cause the Company to enter into the MTA.

Indeed, the contention that SBG and Vision Fund could force the Company to enter into the MTA runs counter to the gravamen of the Complaint, which alleges that the Special Committee independently made this decision for the Company.[152] According to the Complaint, the Special Committee "thoroughly assessed the options available to the Company,"[153] including "certain debt

---

[150] *Id.*

[151] The allegations that "SoftBank" (i) abandoned a plan with Neumann to buy out other stockholders of WeWork in mid-2018 (Compl. ¶ 31) and (ii) contributed to the failure of WeWork's IPO by pressing "the Company to grow at all costs" (Compl. ¶ 34) do not rise to the level of supporting a reasonable inference that SBG and/or Vision Fund threatened or acted to breach a contractual obligation, much less that they exercised actual control over the Company.

[152] Compl. ¶¶ 36, 39.

[153] *Id.* ¶ 40.

financing arrangements through a marketing process led by J.P. Morgan Chase & Co.,"[154] and "approved the transactions to be effected by the MTA"[155] after concluding that the MTA was "in the best interests of the Company and its disinterested minority stockholders."[156] Consistent with these allegations, the only harm alleged in Count II for breach of fiduciary duty stems from a breach of the MTA (*i.e.*, depriving minority stockholders of liquidity by not closing the Tender Offer) and not from execution of the MTA itself.[157]

For the reasons explained above, the court concludes that Count II of the Complaint fails to state a claim for breach of fiduciary duty during the period leading up to the MTA.

### 2. The Fiduciary Duty Claim Post-MTA

Turning to the post-MTA period, the Company again contends that SBG and Vision Fund breached fiduciary duties they owed as the Company's controlling stockholders. The court addressed this same issue with respect to the Neumann Complaint in an opinion issued on October 30, 2020, and incorporates Part III.B. of that opinion herein.[158]

---

[154] *Id.* ¶ 36.

[155] *Id.* ¶ 42.

[156] *Id.* ¶ 40.

[157] *See id.* ¶ 104.

[158] *See WeWork*, 2020 WL 6375438, at *11-14.

In that decision, the court held that, "[e]ven assuming that SBG and Vision Fund owed fiduciary duties to the Company's other stockholders" during this period, Neumann's fiduciary duty claim "must be dismissed because it is duplicative of his breach of contract claims."[159] Critical to reaching that conclusion, the court found that "Neumann does not identify any additional facts relevant to his fiduciary duty claim but not his contract claim" and that "no independent basis thus exists to maintain the claim for breach of fiduciary duty."[160] The Company's fiduciary duty claim suffers from the same deficiency.

The Company's primary contention is that SBG and Vision Fund breached their fiduciary duties by pursuing an alternative transaction—the Trustbridge transaction—to thwart the ChinaCo Roll-Up.[161] The factual allegations supporting this claim are the same as the ones supporting the Company's claim that SBG and Vision Fund breached the MTA by failing to use "reasonable best efforts" to

---

[159] *Id.* at *11.

[160] *Id.* at *14.

[161] *See* WeWork Answering Br. 55-56, 58-59. As a secondary matter, the Company argues that "Softbank wrongfully fabricated a failed closing condition with respect to [certain] lease renegotiations." *Id.* at 59. Tellingly, this issue is described in the section of the Company's brief entitled "SoftBank Reneges on its Contractual Obligations." *See id.* at 22. It also appears that this issue may be academic. *See* Compl. ¶ 76 (explaining that the "Company and [Special] Committee do not believe that the Default Condition has been triggered" as a result of the lease renegotiations.).

complete the ChinaCo Roll-Up.[162] Indeed, the Company jointly alleges the contract and fiduciary claims in the Complaint, which asserts that "SoftBank's actions not only violated the reasonable best efforts covenants of the MTA, but further demonstrate that SoftBank has put its own interests ahead of the minority stockholders to which it owes fiduciary duties."[163]

In sum, given the Company's failure to identify any additional facts relevant to its fiduciary duty claim but not its contract claim, there is no independent basis for the breach of fiduciary duty claim. Accordingly, the Company's fiduciary duty claim stemming from SBG and Vision Fund's post-MTA actions will be dismissed.

## IV. CONCLUSION

For the reasons explained above, SBG and Vision Fund's motions to dismiss are GRANTED in part, and DENIED in part.

**IT IS SO ORDERED.**

---

[162] *See, e.g.*, Compl. ¶¶ 66 ("The terms and conditions of the restructuring with Trustbridge were inconsistent with the roll-up of ChinaCo required by the MTA."), 67 ("On information and belief, SoftBank also had discussions with other ChinaCo minority investors to pressure them not to waive those rights. SoftBank did so despite its obligations under Sections 8.03 and 8.12 of the MTA to use its reasonable best efforts to secure achievement of the ChinaCo roll-up."), 69 ("On information and belief, SoftBank's discussions with Trustbridge and the other minority investors in ChinaCo convinced those investors not to waive their first refusal and co-sale rights, and the JV Roll-Up Condition was not satisfied by April 1, 2020.").

[163] *Id.* ¶ 69.